INGRAHAM, P. J., LAUGHLIN, CLARKE and SCOTT, JJ., concurred.

Judgment and order reversed, with costs, and judgment directed for plaintiff as stated in opinion. Order to be settled on notice.

---

THE PEOPLE OF THE STATE OF NEW YORK ex rel. GEORGE D. SQUIRES and Others, Appellants, *v.* ALPHONSO P. HAND and Others, Respondents.

Second Department, September 23, 1913.

Towns — town of Southampton — constitutional law — statute reducing number of trustees and providing for biennial elections — title to said act — acts not void for uncertainty — impairment of obligations of contracts — statute changing form of municipal government.

Chapter 133 of the Laws of 1902, entitled "An act to provide for the election and to prescribe the terms and compensation of the town trustees in the town of Southampton," etc., is not unconstitutional upon the ground that the title does not indicate the fact that the statute reduces the number of trustees of said town from twelve to five.

The constitutional provision relating to the title of a statute merely requires it to express the subject of the act — so as to indicate the matter with which it deals — but not necessarily all that the act proposes to do.

The trustees referred to in said act are the town trustees elected by the inhabitants and are not the proprietary trustees created by chapter 155 of the Laws of 1818, and hence said act is not void for uncertainty. The proprietary trustees were a separate body vested by the act of 1818 with title to the uplands.

*It seems,* that as the royal charter and charters confirmatory thereof, being in the nature of contracts, gave to the inhabitants of Southampton title to certain lands and water rights, the Legislature cannot impair those rights by subsequent legislation.

But said charters may be amended by subsequent legislation in so far as they affect the governmental agencies of the town.

Moreover, the trustees, having title to the common lands and vested with riparian rights, hold the same in trust for all the inhabitants, and the Legislature can change the number of such trustees and make their term of office biennial to conform to the election of other town officials.

APPEAL by the relators, George D. Squires and others, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of Suffolk on the 23d day of August, 1912, upon the decision of the court after a trial at the Kings County Special Term.

*Charles M. Stafford* [*Thomas Carmody, Attorney-General,* with him on the brief], for the appellants.

*Timothy M. Griffing* [*Thomas Young* with him on the brief], for the respondents.

Judgment affirmed, with costs, upon the opinion of Mr. Justice PUTNAM at Trial Term.

JENKS, P. J., BURR, THOMAS, RICH and STAPLETON, JJ., concurred.

The following is the opinion of Mr. Justice PUTNAM:

PUTNAM, J.:

This is a quo warranto proceeding to determine which of two rival boards are the lawful trustees of the freeholders and commonalty of the town of Southampton. Relators sue as successors of the board of twelve trustees, named in the

colonial charters, having been elected at an April town meeting, as provided by these charters under a procedure continued for over two centuries.

Defendants, known as the *five* board, claim to have been elected as successors to the "present board of trustees" for a two-year term at the biennial town meeting held in various election districts under the act of 1902.

This act is claimed by the relators to be unconstitutional. (1) Being a local act, it is objected that it embraces more than one subject, and that the subject is not expressed in the title; also (2) that it is void for uncertainty. Further (3) that it impairs the obligations of the grants in the charter in violation of the Federal Constitution. (See State Const. art. 3, § 16; U. S. Const. art. 1, § 10, subd. 1.)

The grants were in the charter by Governor Andros in 1676, confirmed and followed by the grant in the Dongan charter of 1686. By the Andros charter the legal title to the common lands vested in the trustees, which the Dongan charter confirmed. (*Trustees of Southampton* v. *Betts,* 163 N. Y. 457.)

These colonial charters were ratified by the Colonial Assembly on May 6, 1691 (1 N. Y. Col. Laws [Comp. Stat. Rev. Comm.], 224, chap. 2) and by successive State Constitutions. (See Const. 1777, art. 36; Const. 1821, art. 7, § 14; Const. 1846, art. 1, § 18; Const. 1894, art. 1, § 17.) Authority has been exercised by these trustees over common lands, riparian rights and town franchises.

The Legislature by acts in 1818 (Chap. 155) and in 1831 (Chap. 283) have recognized these colonial trustees. Meanwhile the growth of population in Southampton made it difficult for the voters from such extensive territory to assemble in one place for an election. General State laws recognized biennial elections (Town Law [Gen. Laws, chap. 20; Laws of 1890, chap. 569], § 10 *et seq.,* as amd. by Laws of 1897, chap. 481, and subsequent statutes; now Town Law [Consol. Laws, chap. 62; Laws of 1909, chap. 63], § 40), and also permitted the separation of the town voters into one or more election districts. (Town Law of 1890, § 40, added by Laws of 1893, chap. 82, as amd. by Laws of 1893, chap. 456, and re-num.

§ 38 by Laws of 1897, chap. 481, § 16; now Town Law of 1909, § 65.)

In 1902 a reorganization statute was passed. The full act is as follows:

" An act to provide for the election and to prescribe the terms and compensation of the town trustees in the town of Southampton in the county of Suffolk, and legalizing payment of compensation to the present and former trustees.

" *The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

" Section 1. There shall be elected in the town of Southampton, county of Suffolk, at the town meeting to be held in such town in April, nineteen hundred and three, and biennially thereafter, as successors to the present board of trustees, five trustees, for a term of two years each.

" § 2. Each of said trustees shall be entitled to receive the same compensation as other town officers for each day he shall be actually and necessarily employed in the discharge of the duties of his office.

" § 3. The payment of compensation by said town, at the above rate, to the present and former trustees of said town for services actually and necessarily rendered by them in the performance of the duties of their office is hereby legalized.

" § 4. This act shall take effect immediately." (Laws of 1902, chap. 133.)

(1) It is urged that because the title of this act does not indicate that the number of trustees had been reduced to five the statute must be held void. The purpose of the Legislature was clear. It was to reorganize the board and to fix their pay, as well as extend the term of office. An act providing for election, terms and compensation of town trustees necessarily must deal with the persons (and their number) who are to be so elected. The Constitution requires that the title shall express the subject of the act — so as to indicate the matter with which it deals — but not necessarily all that the act proposes to do. (*People ex rel. Crowell* v. *Lawrence,* 36 Barb. 177; 41 N. Y. 137.)

The provision that the new trustees shall be five comes in the 1st section. It does not break the unity of the statute. The intent of this inhibition is that the title may apprise the public of the subject of the legislation. If anything has been surreptitiously inserted, or it contains an incongruity such as to mislead, the prohibition applies. Such was the so-called Albany penitentiary amendment. It was annulled because CULLEN, J., found that its title tended to avert public attention from the real subject. (*People ex rel. Corscadden* v. *Howe*, 177 N. Y. 499, 504.) It did not hint that in that act lurked a power to turn over the penitentiary to the sheriff, and even to discontinue it, and to dispose of the land.

On the other hand, the title of this act does not mislead. The number of the trustees to be elected not only had a natural connection with the subject expressed, but was necessary and essential to such a provision, and, therefore, was not within this prohibition. (*Ensign* v. *Barse*, 107 N. Y. 329.)

The later tendency is to construe this provision liberally rather than to embarrass fair and legitimate legislation by over-strictness. (Cooley Const. Lim. [7th ed.] 209; *People ex rel. Devery* v. *Coler*, 173 N. Y. 103.)

(2) After a special town meeting of February 17, 1818, in which it was voted that there should be some alteration respecting the privileges of the town, the Legislature on April 15, 1818 (Laws of 1818, chap. 155), created a new and separate body of trustees — that of the so-called proprietors of lands in common, and conferred upon them the title to the uplands.

In the year 1831 a further statute was enacted, declaring that the trustees of the town should have the sole control and management of the fisheries, seaweed, waters and productions of the waters of the town, and the privileges and franchises granted by the Dongan charter, except so far as they had been changed and altered by the act of 1818.

The proprietor trustees created by the act of 1818 were trustees of private lands and were not elected by the people, and had no public functions.

That the law of 1902 applied to the town trustees cannot be doubted. (*Lane* v. *Tilton*, 43 Misc. Rep. 214.) Although there

had been a board of proprietors' trustees, they were not town trustees, and, therefore, the act fixing the election of "successors to the present board of trustees" pointed clearly to the board that had always been elected by popular vote. Hence this act is not void for uncertainty.

(3) The relators urge that the act offends the Federal Constitution, as impairing the obligation of a contract. (*Dartmouth College* v. *Woodward,* 4 Wheat. 518.) They assert that these charters to Southampton conveyed rights that, once given, could not afterwards be modified. It is said that nearly all the Long Island towns were created by royal charters, or by patents creating corporate bodies, giving the inhabitants more or less power of self-government. Thus in the same year 1686 Governor Dongan granted confirmatory charters to New York city, April twenty-seventh; to Breucklen, May thirteenth, and same day to New Utrecht; to Jamaica, May seventeenth; to Gravesend, September tenth; to New Towne, November twenty-fifth; to Southampton, December sixth, and to Brookhaven, December twenty-seventh.

It is undeniable that these grants established contracts, the obligations of which the State cannot impair. (*Town of Brookhaven* v. *Smith,* 188 N. Y. 74, 77.) These royal charters combined two objects. The towns received a measure of local self-government through agencies and officials named and appointed. But there were also ceded title to the unappropriated lands, also rights in the waters, as well as a relinquishment of the crown rights in the foreshore.

Clearly the obligations protected by the *Dartmouth College* case are those respecting these lands and estates, since the State, as the successor to the crown, cannot retake the lands and waters ceded. "A grant," said MARSHALL, Ch. J., "in its own nature amounts to an extinguishment of the right of the grantor, and implies a contract not to reassert that right." (*Fletcher* v. *Peck,* 6 Cranch, 87, 137.) The State, therefore, cannot assert any right to repossess these lands and waters so as to impair the estate of the town therein.

But this charter did not surrender control over the town officials or erect independent governmental agencies that should forever remain beyond the reach of the Legislature. Such a

perpetual *imperium in imperio* would have been as repugnant to British colonial administration as its inequality and favoritism are opposed to our present political standards.

All these charters have been the subject of legislative modification. No court has questioned this power to make such changes, as such grants are not private but public and governmental. That in its radical modification of the powers of the Southampton trustees, the Legislature responded to a popular demand in 1818, does not detract from its exercise of the right to interfere with these officials. It then took from the chartered town trustees the greater part of their powers, which it conferred on the newly formed board of proprietors.

Huntington's Dongan patent had complete revision in 1872. The territory of Babylon was set off (Chap. 105) and later (Chap. 492) the charter trustees of Huntington were abolished and new town officers substituted. Similar important modifications were enacted in respect to the trustees of Brookhaven. (Laws of 1898, chap. 480, § 4, as amd. by Laws of 1899, chap. 73.) When this constitutional objection was urged as to New York city, it was held that the Dongan charter was governmental and not private, and, therefore, was subject to full power of amendment. (*Demarest* v. *Mayor*, 74 N. Y. 161.)

The fact that these trustees at one time had title to the common lands, and have also title to the lands under water and are vested with riparian rights does not make them the less public. Such title is held in trust for all the inhabitants as a public and governmental agency. The Legislature can, therefore, change the number of such trustees, and can make their term of office biennial to conform to the elections of other town officials.

The *Dartmouth College* case applies to institutions that are private. It would be intolerable to impose such a prohibition upon a municipal charter, however perfect it may be. (*Covington* v. *Kentucky*, 173 U. S. 231, 241.) It is vain to seek to bind town governments to seventeenth century limitations. The principle of the *Dartmouth College* case is not to be extended. It would cripple the State in the effective control of its citizens, and in advance measures for their welfare. Least of all should it be invoked to check the growth and

development of towns which started under conditions now outgrown.

Hence it is concluded that the act of 1902 was in proper form and within the constitutional power of the Legislature. It follows that the defendants are the lawful trustees of the freeholders and commonalty of the town of Southampton, and that the relators are without lawful right to such office.

Judgment is directed accordingly.