THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* RICHARD MILLER and Another, Appellants.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* ARTHUR BURNETT and Another, Appellants.

Second Department, April 29, 1932.

George W. Percy, for the appellants Miller and Burnett.

Lucius H. Beers [Sherman Baldwin and Woodson D. Scott with him on the brief], for the appellant Trustees of the Freeholders and Commonalty of the Town of Southampton.

Robert P. Beyer, Deputy Assistant Attorney-General [John J. Bennett, Jr., Attorney-General, and Peter J. Brancato, Assistant Attorney-General, with him on the brief], for the respondents.

YOUNG, J. The defendants Miller and Burnett took soft clams from the lands under the waters of Mecox bay in the town of Southampton, using for that purpose the propeller of a boat operated by a gasoline motor. Section 322 of the Conservation Law (revised by Laws of 1928, chap. 242, as amd. by Laws of 1929, chap. 273; since amd. by Laws of 1930, chap. 229) provides as follows:

" § 322. Dredging and raking for shellfish. Dredges for taking of shellfish from public or unleased lands shall not be operated from any boat propelled otherwise than by sail or oars. Clams commonly known as hard and soft clams shall not be taken from such lands by the use of any device or instrument not operated solely by hand-power nor shall such lands be dug, raked or otherwise loosened or disturbed, for the purpose of taking or in the taking of such clams, by the propeller or other part of any boat nor by any device or instrument not operated solely by handpower."

Defendants are both residents of the town of Southampton. The method used by them in taking the clams complied with the provisions of an ordinance of the trustees of the town, dated October 29, 1929, as follows: " The taking of any soft clams by use of motors or motor boats shall be prohibited in all waters of the Town of Southampton, with the exception of the waters of Mecox Bay, Shinnecock Bay and Moriches Bay to the westerly limit of the Town. Any violation of this Amended Act will be subject to a

penalty of not less than $25 or more than $50. This act shall take effect immediately upon its publication."

The questions raised by the appellants are as follows:

" (1) Have the trustees of the freeholders and commonalty of the town of Southampton title to the lands under the waters of Mecox bay and the right to manage the productions of the waters?

" (2) Does the term ' public or unleased lands ' in section 322 of the Conservation Law include lands under water to which the State has no title?

" (3) If section 322 of the Conservation Law was intended to apply to the lands under the waters of Mecox bay, does it violate article 1, sections 6 and 17, of the New York State Constitution and article 1, section 10, and the Fourteenth Amendment of the Federal Constitution? "

That the title to the land under the waters of Mecox bay is in the trustees of the freeholders and commonalty of the town of Southampton is beyond question. This was decided in the case of *Town of Southampton* v. *Mecox Bay Oyster Co.* (116 N. Y. 1). Judge BROWN, writing the opinion in that case, referring to the charters under which the town asserted title, said: " Nearly all the Long Island towns were created by royal charters, and the patents were intended not only to create the corporate bodies and thus clothe the inhabitants with the power of government, but also to convey the title to the land within the bounds of town."

There are two royal charters affecting the town of Southampton. The first was dated November 1, 1676, known as the Andros charter, and the second, dated December 6, 1686, known as the Dongan charter. The Andros charter, disregarding its old form of spelling and punctuation, after describing the lands conveyed, provided as follows: " together with all rivers, lakes, waters, quarries, woodland, plains, meadows, pastures, marshes, fishing, hawking, hunting, and fowling and all other profits, commodities   *   *   *.  To have and to hold all and singular the said lands, hereditaments and premises with their and every of their appurtenances and of every part and parcel thereof to the said patentees and their associates, their heirs, successors and assigns forever."

The Dongan charter ratified and confirmed the grant, and conveyed also the waters, lakes and ponds and the easements of fishing, hawking and fowling.

As to these common lands under water, Judge BROWN, writing in the *Mecox Bay* case, said: " The absolute control and management thereof has been exercised by the trustees from the Dongan charter to the present time.

" They leased the fisheries to particular persons, generally on

condition that the fish be sold only to the inhabitants of the town. They prohibited the taking of fish, clams and oysters during certain periods of the year and enforced such prohibition by penalties.

" They leased the land under water for oyster planting, and agreed to indemnify and defend the lessees against assertion of hostile rights in the leased property.

" They sold the seaweed from the beaches, gave consent to the erection of wharves and docks, and regulated the use thereof. Provided for the building of mills on the streams, and in numerous instances passed and enforced ordinances regulating the fishing and oystering in the bay, which is the subject of this suit.

" Such was the usage under the patents down to the year 1818. The town held undisputed possession of the unallotted lands and of the water within the town, and claimed and assumed to hold the legal title."

In *People ex rel. Howell* v. *Jessup* (160 N. Y. 249), which was an action to compel the defendant to remove a bridge constructed by him over the waters of Great South bay near Westhampton Beach in the town of Southampton, it appeared that the defendant had been authorized to build the bridge by the trustees of the freeholders and commonalty of the town of Southampton, and the Court of Appeals held, reversing the judgment below, that the defendant could not be disturbed in constructing the bridge. In the opinion it was stated that the real question involved was whether the town of Southampton is the sovereign as to the lands under water and has control of the waters at this point, and in the course of the opinion Chief Judge PARKER said: " So, in express terms, and by the use of words about the meaning of which there can be no doubt, the sovereign granted to the trustees for the freeholders and commonalty of the town all the waters within the boundaries contained in the grant, as well as the title to the lands under water and all franchises relating thereto. From the sovereign's point of view, as well as from that of the public, this action was politic; for it lodged in the trustees of the town the authority to do all those things which would inure to the benefit of the inhabitants of the town, and at the same time it tended to stimulate them to think out such a course of action as should best employ the waters for the public good. To that end the trustees were invested with the power of management and authorized to perform such acts and make such orders, not repugnant to the laws of England, as they might see fit [pp. 261, 262]. * * * The result of our investigation is that we conclude that the crown had authority to grant not only the land and the lands under the water, but the waters as well at this point, and that the title and the sovereignty over such water

and the lands thereunder was by the Andros and Dongan charters vested in and conferred upon the trustees for the freeholders and commonalty of the town of Southampton, a sovereignty that enabled them to permit the doing of all things that a government may do for the benefit of its people. Subsequently the validity of these charters was affirmed by legislation of the colony [p. 265]. * * * By the several Constitutions of this State great care has been taken to prevent the possibility of a claim that the Constitution affected any of the grants of land made by authority of the king, or annulled any charters to bodies politic made before the 14th day of October, 1775; indeed, the effect of the adoption of the first Constitution was to confirm the grants. (*Sage* v. *Mayor, etc.*, 154 N. Y. 61, 81.) [p. 267]. * * * If we have reasoned accurately thus far, the title to the lands under water and the right of possession and control of the waters in question were in the trustees, who had the right in their sovereign character to do in the discharge of their trust precisely what their predecessor sovereign could have done, or what the State, had it instead of the town succeeded to the title and rights of the English government, might have done, or may yet do, shall it hereafter so succeed, by an exercise of its right of eminent domain. The State, as we have already seen, may authorize such a construction in waters over which it has either retained or regained control, and it follows that the action of the town trustees conferred upon the defendant lawful authority to make the construction " (p. 268).

In addition to this it is pointed out that, on two occasions, the Legislature of the State has recognized that the title to Mecox bay and the land thereunder was in the town. In 1818 (Chap. 155) the Legislature enacted a law providing that all the undivided lands of the town (Mecox bay was never divided) should be managed by the trustees of the freeholders and commonalty of the town of Southampton, and empowered such trustees to sell, lease or partition the same. In 1831 (Chap. 283) the Legislature passed another law reaffirming the rights and privileges granted by the Dongan charter and providing as follows: " § 5. The said trustees shall have the sole control over all the fisheries, fowling, sea weed, waters and productions of the waters within the said town, not the property of individuals, and all the property, commodities, privileges and franchises granted to them by the charter of Governor Dongan, in one thousand six hundred and eighty-six, except so far as are abrogated, changed and altered by the laws of this State, passed in conformity to the Constitution and not now belonging to individuals nor to the proprietors, by virtue of an act entitled 'An act relative to the common and undivided lands and marshes in Southampton, in the

county of Suffolk,' passed April 15th, 1818; and they shall have power to make rules, orders and by-laws for the management thereof and the regulation of their affairs, and to impose such penalties on any person offending against such rules, orders or by-laws, or any of them, as they shall deem meet and proper; such penalty shall not exceed the sum of fifty dollars for any one offence; which penalty may be sued for and recovered in an action of debt, with costs, in the name of the said trustees, in their corporate capacity, in any court having cognizance thereof."

The foregoing plainly shows the legal situation regarding Mecox bay. It is evident that the title to the waters and the land thereunder is in the town, and that for over two centuries, under the royal charters, as confirmed by legislation of the State, the town has exercised continuously acts of ownership, leasing the fisheries and regulating the taking of fish, clams and oysters from the bay; and the town, in passing the ordinance under which the defendant took the clams in question, was only continuing the exercise of its rights which had been carried on for a long period of time. Nevertheless, the respondent claims that section 322 of the Conservation Law applies to Mecox bay in spite of the provisions of the charters and the acts of the Legislature giving to the town the sole control over all the fisheries, etc., within said town. The Attorney-General states in his brief that, in so far as the grant of the land and the shellfish is concerned, it is a private grant, and the State may not be able to disturb the ownership, but in regard to the management by the State and making this property subject to general public law the State retained full power. The State evidently admits the ownership in the town of the lands and waters of Mecox bay and even the clams living in the sand underneath the water, but argues that the State may still legislate as to the management of this property in the exercise of the police power. In the first place, there is apparently no reason shown for the exercise of the police power in preventing the taking of clams in Mecox bay. Furthermore, even if the State had such power reserved in spite of the royal charters, it apparently ceded such power when it passed the act of 1831, giving to the trustees of the town the sole control over all the fisheries, etc., within the town. PUTNAM, J., writing in *People ex rel. Squires* v. *Hand* (158 App. Div. 510), states that, as to lands and estates, when the State cedes waters and lands it cannot retake them, and he cites *Dartmouth College* v. *Woodward* (4 Wheat. 518) and quotes Chief Justice MARSHALL in *Fletcher* v. *Peck* (6 Cranch, 87, 137) to the effect that a grant amounts to an extinguishment of the right of a grantor and implies a contract not to reassert that right. The Attorney-General insists that the

royal charters and the acts of the Legislature referred to did not grant to the town the sovereign right of legislation in the conservation of aquatic life. A number of cases are cited; among them *Phelps* v. *Racey* (60 N. Y. 10); *Barrett* v. *State of New York* (220 id. 423); *Silz* v. *Hesterberg* (211 U. S. 31, affg. 184 N. Y. 126); *Miller* v. *McLaughlin* (281 U. S. 261); *Gratz* v. *McKee* (258 Fed. 335); *Matter of Fishway, Town of Deposit* (131 App. Div. 403).

These cases have to do with migratory wild game and fish, including shellfish in the category of fish, and do not appear to be in point. Mecox bay is entirely land-locked, with no outlet, and it is wholly owned by a single party, to wit, the town. The argument of the Attorney-General is that clams are generally classified as a kind of fish, and fish, because of their migratory character, are classed as *ferœ naturœ* and that their ownership while in a state of freedom is in the State in its sovereign capacity, and ownership thereof may not be claimed by any particular individual. The appellants, however, point out that clams are not migratory; that they never move and are not at all like fish and cannot be classified as *ferœ naturœ*. The appellants' counsel states that the only case he has been able to find which discusses the proper classification of clams is *Sequim Bay Canning Co.* v. *Bugge* (49 Wash. 127). That action was brought to enjoin the defendants from trespassing on certain lands for the purpose of taking and removing clams, which lands had been leased to the plaintiff. The defendant claimed that the lease did not give to the plaintiff a right superior to that of the public to take clams. Upon appeal, the Supreme Court of the State of Washington held for the plaintiff, Chief Justice HADLEY stating in his opinion as follows: " * * * the gathering and taking of clams requires a digging down into the soil, a contact with and disturbance of the land itself. Even if clams should be classified as fish under the term ' shellfish,' as suggested by respondents, still they cannot be taken by the use of any methods exercised in the prosecution of the common right of fishing in the waters. Clams ordinarily live in the soil under the waters, and not within the waters. It is true they derive a part of their sustenance from the sea during the times the waters overspread the lands; but at other times they live, not merely upon, but actually within the land. They therefore, in a very material [sense, belong with the land. When taken they must be wrenched from their beds, made well down in the soil itself. It must follow therefore that, if the State has authority to invest one with the private ownership of the tide lands, such investiture must carry with it the right to exercise dominion and ownership over what is upon the land, and especially over things so closely related to the soil as clams."

The appellants also cite *People* v. *Conrad* (125 Mich. 1). In that case the defendant, with others, owned a lake, covering about fifteen acres, which had no inlet or outlet. Permission was obtained from all the owners to spear fish in the lake, for which they were arrested and tried under a statute which prohibited the spearing of fish in any of the inland lakes of the State. The court held that the statute did not apply to this privately-owned lake, and in the opinion it was stated: " This lake is private property. Its owners have entire control over it, and the right to fish in it. The public have no interest in it. If it were connected with other lakes and streams, so that fish might pass in and out of it, others than the owners would then have an interest in the protection of the fish in the lake. This act cannot be construed to include private ponds or lakes, in which the public have no interest."

Another case cited by the appellants is *State* v. *Roberts* (59 N. H. 256), in which the court held that the State Legislature had a perfect right to regulate and protect the public right to have migratory fish pass up and down the rivers and streams. It also said as follows: " But while the Legislature has power to regulate and limit the time and manner of taking fish in waters which are public breeding-places or passage-ways for fish, it has not assumed to interfere with the privileges of the owners of private ponds having no communication through which fish are accustomed to pass to other waters. Such ponds, whether natural or artificial, are regarded as private property, and the owners may take fish therefrom whenever they choose, without restraint from any legislative enactment, since the exercise of this right in no way interferes with the rights of others."

I do not believe that clams can be classified as *feræ naturæ*, and as to game and fish, so classed, I cannot find that the courts have upheld the right of the State to legislate over them when found upon private property, unless they were in streams or other waters from which they might escape. An interesting case cited by the appellants is *Smith* v. *Odell* (234 N. Y. 267). That was an action brought to cancel two leases given by the trustees of the freeholders and commonalty of the town of Brookhaven to one Kreamer, covering lands lying under water in the Great South bay, and the leases were given for the sole purpose of permitting the lessee to shoot wild fowl on said water; and the Court of Appeals held that the title to the land leased was in the trustees under the ancient charters (and these charters were similar to those governing Southampton), and upheld the power of the town to make the leases. It does not appear whether the leases given were in violation of any of the conservation laws of the State, but no qualifica-

tion, other than the right of the public to use the water for navigation, seems to be made in the opinion in that case of the absolute power of the trustees to make the leases. In my judgment, the town in the present case has the absolute right under the ancient charters to control and manage Mecox bay and its productions, and if there was any right reserved to the State to exercise its police powers over these waters it ceded such right when, by the act of 1831, it gave to the town the sole right to control the fisheries, waters and productions of the waters within the town of Southampton. If I am right in this conclusion, it is unnecessary to discuss the other points raised by the appellants.

The judgment in each case should be reversed upon the law, with costs, and the complaint dismissed, with costs.

LAZANSKY, P. J., KAPPER and HAGARTY, JJ., concur; CARSWELL, J., dissents.

In each case: Judgment reversed on the law, with costs, and complaint dismissed, with costs. Findings of fact and conclusions of law inconsistent herewith are reversed and new findings and conclusions will be made to support this decision.

Settle order on notice.