■ STATE OF NEW YORK et al., Respondents, v TRUSTEES OF THE FREEHOLDERS AND COMMONALTY OF THE TOWN OF SOUTHAMPTON, Appellants. — In an action, *inter alia,* to declare certain "Rules and Regulations for the Management and Products of the Waters of Southampton" null and void, defendants appeal from a judgment of the Supreme Court, Suffolk County (Underwood, J.), entered July 12, 1982, which granted plaintiffs' motion for summary judgment and declared the subject rules and regulations to be null and void. Judgment reversed, on the law, without costs or disbursements, motion denied, and matter remitted to the Supreme Court, Suffolk County, for trial in accordance herewith. The State of New York issues fishing licenses which permit the taking of fish at various times of the year in certain ways from State waters specified in the license (see, generally, ECL art 11). On May 2, 1977, the defendants enacted a new set of rules and regulations for the management and products of the waters of the Town of Southampton which, *inter alia,* limit freshwater fishing therein to residents and student residents of the town, and impose regulations which conflict with the ECL regarding the method or manner of taking fish. (Cf. 6 NYCRR part 10 with Rules and Regulations for the Management and Products of the Waters of the Town of Southampton, art III.) As a result, the State of New York and the Commissioner of Environmental Conservation commenced the instant proceeding for a judgment declaring the relevant and inconsistent rules and regulations of the town to be null and void pursuant to ECL articles 11 and 13. Plaintiffs then moved for summary

judgment "upon the grounds regarding pre-emption by the plaintiffs of fishing in the town". Special Term granted summary judgment to the plaintiffs declaring the town's rules and regulations in question null and void, finding that the State had pre-empted the town's right to legislate in this area. We disagree, and find that the record before us does not support granting plaintiffs' motion for summary judgment. While it is true, as Special Term found, that a municipality may not enact a local law which is inconsistent with or in derogation of a general law of the State (*Consolidated Edison Co. v Town of Red Hook,* 60 NY2d 99; *People v Cook,* 34 NY2d 100; *Matter of Ames v Smoot,* 98 AD2d 216; *Wholesale Laundry Bd. of Trade v City of New York,* 17 AD2d 327, affd 12 NY2d 998), the State may not impose legislation upon privately held property, absent legitimate bases founded upon a valid exercise of its police powers and, when such is done, a compensable taking may occur (see *People v Miller,* 235 App Div 226, 231, affd 260 NY 585; *People ex rel. Howell v Jessup,* 160 NY 249, 268). This is specifically recognized by the ECL which exempts from State ownership all fish, game, wildlife, shellfish, crustacea and protected insects which are "legally acquired and held in private ownership" (ECL 11-0105) and, in addition, allows for the establishment of private parks and waters (ECL 11-2109). The defendants herein are the successors to the original trustees of the freeholders and commonalty of the Town of Southampton whose proprietary rights to certain lands and waters of the Town of Southampton and their right to legislate and control the same as a body politic is derived from antique, royal land grants and patents which have been repeatedly confirmed and upheld throughout the history of this State for over 300 years by both the framers of the State Constitution and the Legislature despite various specific attacks upon such authority (see *People v Miller,* 235 App Div 226, *supra,* and cases therein cited and discussed). Though we recognize the fact that provisions contained in ancient land grants have been held under certain circumstances to be less than sacrosanct (see *Demarest v Mayor of City of N. Y.,* 74 NY 161; *People ex rel. Squires v Hand,* 158 App Div 510), the grant of authority to the defendants, confirmed by the decisions of the courts of this State, recognizes a private right of ownership to property administered by defendants as a body politic. Such property rights in the people of the Town of Southampton would remain and exist even if the town's existence as a municipal government were terminated entirely. Thus, absent some countervailing consideration, the State may not interpose the legislation in issue here upon the people of the Town of Southampton. Plaintiffs have failed to point to any such consideration in this case. Though the State asserts its desire as *parens patriae* to protect fish and fry and to conserve our natural resources, which is a seemingly valid exercise of its police powers, the record before us does not establish, as a matter of law, that this consideration is a valid one. "Fish running at large * * * *ferae naturae,* and while in their natural element unconfined, are the public property of all the people of the State in common, and no person can acquire property therein, divested of the rights of others, excepting by taking and reducing them to actual possession" (*Matter of Fishway in Town of Deposit,* 131 App Div 403, 410; cf. *Smith v Odell,* 234 NY 267, 270-272). There is no proof submitted herein regarding the specific waterways involved, the nature thereof, and the abilities of the fish in question to pass freely in and out of them. The only assertion pertaining to those issues is the contention of defendants' counsel in an affidavit that acceptance of plaintiffs' arguments would permit State legislation with respect to a fishbowl. If in fact the waterways involved are, in effect, very large fishbowls, from which fish in the wild, *ferae naturae,* can neither enter nor escape, and their population is maintained solely through stocking and spawning therein, as appears to be the case, we see no need for State management. Any necessary

conservation may be effected by the stocking of these waterways, an act which precedes the taking of fish therefrom by anglers. Since we are not informed of the specific nature of things in this regard, we cannot say, as a matter of law, whether any State right, vis-à-vis a totally private right, is herein involved. Plaintiffs' assertion, relying on *Rogers v Jones* (1 Wend 237) and *Lawton v Steele* (119 NY 226), that the State may legislate regarding private as well as public waters for the conservation of fish and fry must be rejected with qualification. Both those cases involved waterways which were arms of the sea, and fish which were *ferae naturae,* which, though swimming through private waters, nevertheless remained within the public domain. As we have indicated, the record before us precludes a finding, as a matter of law, that such is the situation here. Years after the decisions in *Rogers v Jones (supra)* and *Lawton v Steele (supra)*, this court, in arriving at the decision in *People v Miller* (235 App Div 226, *supra*), a case which the State would erroneously have us limit to legislation regarding clams and other crustacea bound to the land underwater, specifically stated that it had found that the courts had not upheld the right of the State to legislate over fish classified as *ferae naturae* "when found upon private property, unless they were in streams or other waters from which they might escape" (*People v Miller, supra,* p 233). As previously noted, *Miller (supra),* which was affirmed by the Court of Appeals (260 NY 585, *supra*), would support a finding in defendants' favor herein, were it established that the waterways involved in fact confined the free passage of the subject fish to within their boundaries. In so holding, we are not unmindful of ECL 11-2109 which precludes the laying out as private any waterway which was stocked with fish by the State of New York during the times herein involved and the State's claim that it has, from time to time, in varying amounts and for varying durations, stocked the waters of the Town of South-ampton. Our examination of the record on appeal has, however, revealed that if the State has stocked the waters in question, its stocking of those waters has diminished to a great extent over the years, it was sporadic, there is a question as to whether it was done with town approval, and proof that the town requested it is equivocal. We are reluctant to grant to the State in perpetuity an unqualified right to consider waters stocked by it to be public or State waters, where there is no proof that the State has in fact stocked those waters, and, if the State has stocked those waters the genesis of its action is unclear, the knowledge of it and its consequences by the local municipality has not been shown, and the relative breadth of such action vis-à-vis the size of such waterways involved and the efforts by the town to stock those waters has not been established. In order to find in favor of plaintiffs we would require a more definitive and higher degree of proof than may be found in this record. The same failure of proof exists with regard to plaintiffs' contention that the town, by its acts, has dedicated the use of its waters, and its fish, to the public. The specific circumstances of public use of Southampton's waters are unclear on this record. We think that questions of fact are presented as to whether the public at large beyond the boundaries of the town was ever invited to utilize its waters or whether the use thereof by outsiders was knowingly suffered by the defendants for a period of time and under circumstances sufficient to constitute an intentional dedication of fishing rights to the public so as to preclude local legislation extending such rights, in the main, to local residents only, exclud-ing outsiders whether they are possessed of a State fishing license or not. The different interpretations which might be accorded the evidence herein pre-sented and the possibility of an innocent, unintentional relinquishment of valuable property rights compel us to hold that the record is insufficient to grant summary judgment to the plaintiffs. Significant questions of fact are presented. We are not compelled by any authority cited by our dissenting

colleague, Justice O'Connor, Special Term, or the parties, to hold otherwise. Accordingly, a trial is necessary. Gibbons, J. P., Brown and Boyers, JJ., concur.

O'Connor, J., dissents and votes to affirm the judgment, with the following memorandum: I dissent and vote to affirm the judgment annulling certain rules and regulations for the management and products of the waters of the Town of Southampton. This judgment was obtained by the State of New York and the Commissioner of Environmental Conservation on their complaint which alleged, *inter alia,* that the comprehensive conservation plan of the Fish and Wildlife and Marine and Coastal Resources Laws (ECL arts 11, 13) and regulations promulgated pursuant thereto had pre-empted the entire field of fishing conservation to the exclusion of local regulation. The complaint alleged that the challenged local regulations were inconsistent with State rules respecting fishing seasons and devices and imposed a residency requirement in conflict with State law. The town's answer was a declaration of independence, "deny[ing] that [the] State is sovereign with respect to the matters * * * alleged in such complaint and deny[ing] the State has any power, authority, right or obligation to bring this action". It is the town's position, according to its reply brief, that its waters and lands are "private and proprietary" because its colonial charters vest in it "sole and absolute control" over them to the exclusion of the State. In my opinion, appellants, the trustees of the freeholders and commonalty of the town, encouraged by language in *People ex rel. Howell v Jessup* (160 NY 249, 268) and *People v Miller* (235 App Div 226, 231, affd 260 NY 585), have misconstrued the nature of their charters. The issue is not the State's sovereignty against the town's "private" property. Rather, the issue is one of home rule, and for purposes of analysis the terms sovereignty and property are synonymous. The town stands in no better position with respect to the State's pre-emption of fishery management than does any other municipal entity, chartered or not chartered. Hence I believe the judgment was properly made. The fundamental charter of the town is the Dongan Patent of 1686. The charter recited a prior grant of 1676 to appellants' predecessors, and essentially confirmed it upon noting that the provisions in the prior charter "for constituting them a towne and giving them privileges and Imunityes" had not been "sufficient in law to convey to them such privileges & Imunityes as was designed to be given them". Therefore, in order to "[e]rect the said towne of Southampton * * * into one Towneship" Governor Thomas Dongan, as the agent of King James the Second, ratified and confirmed to its inhabitants and their heirs and assignees forever the prior grant of lands, franchises, profits and hereditaments, excepting gold and silver mines, to hold "of his said Majesty his heires and Successors in ffree and Comon Soccage according to the Mannor of East Greenwich in the County of Kent within his Majestyes Realme of England". The charter declared the inhabitants, freeholders and freemen to be a body corporate and politic, capable of taking and conveying property and suing or being sued. It set forth the procedure for choosing town officers, empowered them to make such acts and orders as would be convenient, "so alwayes as the said acts and orders be in no wayes repugnant to the laws of England or of this Province [of New York] which now are or hereafter may be Established". By act of the colonial assembly of 1691 the various charters of the province's municipalities were confirmed, and a provision in the first Constitution of the State declared that nothing in it would prejudice rights previously granted by such charters to bodies politic (NY Const of 1777, § XXXVI). By section IV of chapter 155 of the Laws of 1818, passed April 15, 1818, the town was authorized to continue its management of local fisheries for the benefit of the town. A further act, chapter 283 of the Laws of 1831, provided in section 5 that the town would have "sole control over all the fisheries" within the town not the property of individuals, as granted by the Dongan

Patent, "except so far as are abrogated, changed and altered by the laws of this state, passed in conformity to the constitution and not now belonging to individuals". By their terms the Dongan Patent and subsequent legislative acts confirming it merely created a traditional municipal corporation — not a glorified, private landowners' association, as appellants believed it to be. Appellants' confusion stems from their misunderstanding of the legal terminology commonly utilized in the colonial era to erect such municipal entities. Hence an interpretation is called for. As under all the colonial charters, the grantees under the Dongan Patent were "holden of the crown in free and common socage by fealty only and not *in capite*, or by knight's service * * * either as of the manor of East Greenwich [as here] or of the manor of Hampton Court in Middlesex, or of the castle of Windsor in Berkshire" (1 Story, Commentaries on the Constitution of the United States [5th ed], § 172, p 125). This antique boilerplate simply meant that the real property and privileges granted were allodial instead of feudal, i.e., held directly of the sovereign — the lord paramount — rather than mediately of one or several feudal lords. Thus these grants conveyed not merely the profits (feud) of the soil to the inhabitants as vassals but the soil (seigniory) itself, reserving to the crown its ultimate sovereignty (which included gold and silver mines). The purpose of such charters was to confer upon the inhabitants of the territory involved the same near-absolute power that a mesne lord could have exercised over them by baronial prerogative, and hence constituted a barrier against the abuses of feudalism (see 1 Story, Commentaries on the Constitution of the United States [5th ed], § 19, p 12; § 172, p 125; 2 Kent's Commentaries [14th ed], p 412; 3 Kent's Commentaries [14th ed], pp 594-595, n [b]; pp 763-764, 784, n [a]; 2 Lincoln, The Constitutional History of NY, pp 199-203). In sum, these charters conferred self-government — home rule — upon the inhabitants, as an alternative to appointment of local administrators exercising governmental powers as agents of the crown (see 1 Story, Commentaries on the Constitution of the United States [5th ed], § 20, pp 12-13). As a body corporate and politic, i.e., an association of individuals, such entities were empowered to take and grant property and to sue and be sued in perpetual succession (see *Hornbeck v Westbrook,* 9 Johns 73; 1 McQuillin, Municipal Corporations [3d ed], § 1.16, p 18; 3 Holdsworth, A History of English Law [3d ed], pp 479-480; 2 Kent's Commentaries [14th ed], pp 412, 413, n [e]; 56 Am Jur 2d, Municipal Corporations, § 1, p 72, n 1). The self-government thus created, of course, was limited. All charters provided that no local laws could be repugnant to the common law or statutes of the mother country (1 Story, Commentaries on the Constitution of the United States [5th ed], § 156, p 109; § 163, p 116; § 164, pp 116-117). To further safeguard the "superintending" authority of the sovereign, "it was enacted by Parliament in 7 & 8 William 3, ch. 22, 'that all laws, by-laws, usages, and customs which should be in practice in any of the plantations, repugnant to any law made, or to be made in this kingdom relative to the said plantations, shall be utterly void, and of none effect' " (1 Story, Commentaries on the Constitution of the United States [5th ed], § 164, p 117). The principle that the acts of bodies corporate were regulated by the common law and the acts of the sovereign had been established by the fourteenth century (3 Holdsworth, A History of English Law [3d ed], pp 476-477; 1 Blackstone, Commentaries on the Laws of England [1st ed], pp 463-464). During the Tudor period and down to the Long Parliament, the council and star chamber strictly controlled local governments, and after the breakdown of such control during the Interregnum, regulation was accomplished through statutes of Parliament, common-law prerogative writs, criminal process or civil actions against public officials and units of local government. The Restoration was marked by the liberal use of writs of quo warranto to modify, revoke or force the surrender

of various charters (see 6 Holdsworth, A History of English Law [3d ed], pp 57, 210-211; 9 Holdsworth, A History of English Law [3d ed], pp 46-48; 10 Holdsworth, A History of English Law [6th ed], pp 132-133; see, also, *Purdy v People*, 4 Hill 384, 391; Jenks, The Prerogative Writs in English Law, 32 Yale L J 523, 530-531; 2 Kent's Commentaries [14th ed], pp 485-486, 495-496; 1 Story, Commentaries on the Constitution of the United States [5th ed], § 41, p 20; § 42, pp 20-21; § 46, p 23). With the rupture of the American Revolution, which ended with the Treaty of Paris in 1783, "Great Britain relinquished all claim, not only to the government, but [also] to the 'propriety and territorial rights of the United States,'" thus conferring her sovereignty on the various States on the Atlantic seaboard (*Johnson v M'Intosh*, 21 US [8 Wheat] 543, 584). Thus, the people of the State succeeded the crown as lord paramount in socage in New York (see 3 Kent's Commentaries [14th ed], pp 782-783). In legal theory, accordingly, the people of New York were able to declare, without any inconsistency, since all "sovereignty" was vested in them, that they possessed "the original and ultimate property in and to all lands within the jurisdiction of the State", and yet that all lands were "allodial, so that * * * the entire and absolute property is vested in the [individual] owners, according to the nature of their respective estates" (NY Const of 1846, art I, §§ 11, 13). Thus the rights of property — even "absolute" property — remained subject to the sovereignty, that is remained the original and ultimate property of the people instead of the crown. Inasmuch as the terms "sovereignty" and "property" both import merely the power of the proprietor or sovereign to prevent interference with his right to scarce resources such as land and its profits, and are thus at root indistinguishable concepts, this appeal cannot be determined by merely classifying the town's fishing regulations as an exercise of either its proprietary or governmental powers. The distinction between proprietary and governmental powers exercised by municipal entities has been of use only in relation to analyses of their liability for tortious conduct while acting for their special advantage rather than as agents of the State (see, e.g., *Augustine v Town of Brant*, 249 NY 198, 204-205; *Springfield Fire & Mar. Ins. Co. v Village of Keeseville*, 148 NY 46, 52-54; 1 McQuillan, Municipal Corporations [3d ed], § 1.32, p 35), and their entitlement to just compensation upon a taking of their property by the State (see *People ex rel. Howell v Jessup*, 160 NY 249, 268, *supra; Town of Hornellsville v City of Hornell*, 38 AD2d 312; *Matter of City of New York [Inwood Hill Park]*, 219 App Div 478). The concept of a municipal corporation as a proprietorship has never meant that its property belongs to its inhabitants as individuals or that its inhabitants' property belongs to it (see *People ex rel. Howell v Jessup*, 160 NY 249, 259, *supra; Town of North Hempstead v Town of Hempstead*, 1 Hopk Ch 288, 292-293, affd 2 Wend 109; 3 Holdsworth, A History of English Law [3d ed], pp 482-484). Rather, its property is deemed public property vis-à-vis individuals and private only vis-à-vis the State: in sum, its proprietary or private nature is what modern law characterizes as its right of home rule respecting its property, affairs or government (see NY Const, art IX; *Darlington v City of New York*, 31 NY 164, 193-194; *People v Morris*, 13 Wend 325, 337; 1 McQuillin, Municipal Corporations [3d ed], § 2.09, p 147; 2 McQuillin, Municipal Corporations [3d ed], § 4.79, p 134).[*] In the instant case the State's claimed pre-emption of fishing management hardly amounts to such an invasion of home rule as to prompt the town

---

[*] Nothing in the Federal Constitution protects the proprietary interests of local governments against their State sovereigns (see *City of Trenton v State of New Jersey*, 262 US 182; *Demarest v Mayor of City of N. Y.*, 74 NY 161, 166-167). Further, the equal protection clause of the Fourteenth Amendment, cited by the State in relation to the residency issue but not dispositive of this appeal, deems all acts of municipal officials to be acts of the State (see *Hassan v Town of East Hampton*, 500 F Supp 1034; *Matter of Johnson*, 93 AD2d 1, 6 [citing cases], revd on other grounds 59 NY2d 461).

fathers to hide their charter in an oak tree as did their Connecticut cousins some three centuries ago to frustrate a Stuart king's demand for its surrender (1 Story, Commentaries on the Constitution of the United States [5th ed], § 88, p 60). Notwithstanding language to the contrary in *People v Miller* (235 App Div 226, 231, affd 260 NY 585, *supra*), I believe that the delegation of fishing management powers by a crown implicity and the Legislature explicitly to the town officials was not irrevocable. A perpetual, irrevocable delegation of the power to regulate fishing resources would violate the very concept of sovereignty as a vesting in the crown, and later, in the people, of the original and ultimate property rights in all resources within New York. By virtue of its sovereign nature, the State, on behalf of the people, must be forever free to regulate resources and thus to control sovereignties of lesser dignity, such as the Town of Southampton, subject to home rule restrictions in the State Constitution which prohibit takings without just compensation (cf. *People ex rel. Howell v Jessup,* 160 NY 249, 268, *supra*). Furthermore, it has been the common law from the earliest ages that the sovereign was empowered to regulate the particular resource of fishing in private waters (see *Lawton v Steele,* 119 NY 226, 234-235; *Rogers v Jones,* 1 Wend 237; 3 Kent's Commentaries [14th ed], pp 630-632, 636-637). I am therefore in agreement with the State's position that its comprehensive fishing management program under the ECL has lawfully superseded the appellants' program. Accordingly, I vote to affirm the judgment.