OPINION OF THE COURT
Geoffrey J. O’Connell, J.
By decision and order dated April 6, 1998 (249 AD2d 295) *1026 the Appellate Division, Second Department, reversed the order of this court dated April 7, 1997 which had denied the Town of Oyster Bay’s motion for a preliminary injunction. The matter was remitted for reconsideration and a hearing was held on July 14, 1998.
FINDINGS OF FACT
The Town of Oyster Bay (Town) commenced three proceedings related to Commander Oil’s proposed dredging of Oyster Bay in the vicinity of the dock it uses to offload oil from barges for storage. Index number 20951 of 1995 was a CPLR article 78 proceeding to compel the New York State Department of Environmental Conservation to revoke the permit it had issued for the proposed dredging. This court ultimately dismissed that proceeding by order dated October 1, 1997. The Town did not perfect an appeal.
Index number 25344 of 1995 was an article 78 proceeding challenging a determination of the New York State Department of State that, with certain modifications, the maintenance dredging proposed by Commander Oil was consistent with the New York State Coastal Management Program. This court found that there was a rational basis for the determination and denied the petition by order dated April 7, 1997. No appeal of that order was perfected.
In the present matter, based upon the hearing held on July 14, 1998 and records submitted in the related proceedings (see, Prince, Richardson on Evidence § 2-209 [Farrell 11th ed]; Matter of Ordway, 196 NY 95; Rossbach v Rosenblum, 260 App Div 206, affd 284 NY 745), the court finds the following facts.
In 1929 Commander Oil purchased property at the foot of South Street and Bay Street in the Hamlet of Oyster Bay and bordering on Oyster Bay Harbor where it established a petroleum bulk storage facility. At some unspecified date prior to 1952 it constructed a pier at which barges containing oil were docked and offloaded. In 1952 the original pier was replaced with the one which survives to the present and which is equipped with a trestle supporting piping used to pump oil from the barges to the storage tanks.
The Town and Commander entered into a series of lease agreements covering a parcel of land adjacent to the Commander Oil property and the land under Oyster Bay Harbor to which the Town holds title under a grant from Colonial Governor Andros. The most recent such lease with a term *1027 which commenced on September 1, 1960 authorized Commander Oil, inter alia, “to dig or dredge such channels as may be necessary to allow docking privileges”. This lease expired in 1985. Whether such leases derived from an excess of caution or a mistaken understanding of an upland owner’s legal rights (see, Town of Hempstead v Oceanside Yacht Harbor, 38 AD2d 263, affd 32 NY2d 859), the expiration of the most recent lease is significant only in that the express consent to dredging contained in the lease is no longer effective.
There is no evidence of dredging the basins on either side of the pier prior to 1966. By letter dated December 8, 1966, the Army Corps of Engineers authorized Commander Oil to dredge both basins to a depth of 12 feet beneath mean low water. The letter includes a caveat that it conveys no property rights and “does not authorize any injury to private property.” The authorized dredging was accomplished sometime prior to the permit expiration date of December of 1969; A permit from the Army Corps of Engineers dated November 9, 1970 authorized similar dredging of both basins to a depth of 12 feet with a similar caveat being the first of 20 conditions to the permit. The Army Corps of Engineers again issued a permit dated March 13, 1975 which authorized “maintenance” dredging of both basins to a depth of 14 feet below mean low water with the caveat as to creating property rights listed as “h” on the general conditions to the permit. The permit was valid until March 13, 1985. Commander Oil did not again apply for a dredging permit until the application being litigated here was made in 1995.
Upon Commander Oil’s application the New York State Department of Environmental Conservation issued a permit effective March 20, 1995 authorizing maintenance dredging to a depth of 14 feet below mean low water which the Town challenged in one of the related article 78 proceedings. Among the “Other Legal Obligations of Permittee” as item 6, the permit states that it does not convey any property rights nor authorize impairment of the property rights of any person not a party to the proceeding. On April 20, 1995, the Department of State issued its consistency determination which was challenged in the other article 78 proceeding. Staff recommendation 3 to that determination states: “Because of questions regarding the need for using the east basin, the applicant must receive permission from the owner of the underwater lands, which may be the Town of Oyster Bay, to occupy and use the underwater lands.”
By summons and complaint dated September 16, 1996, the Town sought a permanent injunction prohibiting Commander *1028 Oil from dredging both basins at its pier on the grounds that it had not complied with the requirement that it obtain permission from the Town. Paragraph 5 of the complaint states: “As owner of said lands, the Town unequivocally denies permission for the proposed dredging right project.” The Town also moved for a preliminary injunction and defendant cross-moved for summary judgment.
CONCLUSIONS OF LAW
“By the common law, both the title and the dominion of the sea, and of rivers and arms of the sea, where the tide ebbs and flows, and of all the lands below high water mark, within the jurisdiction of the Crown of England, are in the King.” (Shively v Bowlby, 152 US 1, 11.) In his great treatise, De Portibus Maris, Lord Hale elaborated upon this dichotomy between legal title, jus privatum, which the sovereign might convey to a subject, and the jus publicum or public right of passage and re-passage which could not be alienated. “ ‘[S]uch a right * * * belongs to the King jure prerogativae, and it is a distinct right from that of propriety; for, as before I have said, though the dominion either of franchise or propriety be lodged either by prescription or charter in a subject, yet it is charged or affected with that jus publicum that belongs to all men, and so it is charged or affected with that jus regium, or right of prerogative of the King, so far as the same is by law invested in the King.’ Hargrave’s Law Tracts, 84, 89.” (Shively v Bowlby, 152 US 1, 12-13.) Thus, in Trustees of Freeholders & Commonalty v Smith (188 NY 74, 78-79), the Court of Appeals held that whatever rights were conveyed by royal colonial grants were subject to the public rights of navigation and to the rights of access of riparian and upland owners.
The Andros patent by which the Town of Oyster Bay holds title to the land under Oyster Bay was granted at a time when neither the State of New York nor the United States existed. With both King Charles II and the Duke of York, his brother and the colonial proprietor, separated from the colony by an ocean, the colonial patents were intended to confer a measure of home rule. (State of New York v Trustees of Freeholders & Commonalty, 99 AD2d 804, 808 [O’Connor, J., dissenting].) Upon the separation of the colonies from England by the Declaration of Independence, title to the lands under tidewaters which had been vested in the King passed to the States in which they were situated. (People v New York & Staten Is. Ferry Co., 68 NY 71, 77-78.) Article XXXVI of the New York *1029 State Constitution of 1777, however, ratified all grants previously made by the King of England and by statute (see, e.g., Navigation Law § 2 [4]). Nassau and Suffolk Counties were afforded special treatment as to their navigable waters.
While the Town’s title to the land under Oyster Bay derived from the Andros patent thus survives, it is only the jus privatum subject to the jus publicum which is vested in the State and includes the public right of navigation. Additionally, by virtue of the Commerce Clause of the United States Constitution, it is also subject to a Federal navigation servitude. (4 Beck, Waters and Water Rights § 30.05 [3d ed].) The King could not alienate the jus publicum nor can the State abdicate its responsibility to act in the best interest of the public at large. “The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.” (Illinois Cent. R. R. v Illinois, 146 US 387, 453.) Thus, in Smith v State of New York (153 AD2d 737), the Appellate Division, Second Department, said that an association claiming title to land under Long Island Sound by virtue of a grant from the State would not be permitted to exclude the public if it were found to be contrary to the benefit of the public at large because the public right of navigation and fishery supersedes any private right.
Both the State and Federal Governments have enacted legislation in the exercise of their rights with respect to tidal waters. The Commissioner of Environmental Conservation, in granting a permit to dredge, was required to consider the compatibility of the proposed activity with the public health and welfare, marine fisheries, shell fisheries, flood and hurricane and storm damage. (ECL 25-0403 [1].) The Town’s challenge to the determination to grant the permit failed. Similarly, the New York Department of State purported to consider the relevant policies in reaching a determination that the proposed dredging was consistent with New York State’s Coastal Management Plan and that determination was sustained against the Town’s challenge.
The Town claims an ultimate veto power over the proposed project based upon Coastal Management Plan Staff recommen *1030 dation 3 requiring “permission from the owner of the underwater lands, which may be the Town of Oyster Bay, to occupy and use the underwater lands.” The State, acting through Coastal Management Plan Staff, however, could neither delegate the State’s fiduciary and statutory obligation to protect the interests of the public at large in the public use of navigable waters (see, 4 Beck, Waters and Water Rights § 30.02 [c] [3d ed]) nor expand the private property rights of the Town as owner of the land under Oyster Bay.
In its decision on the application for a preliminary injunction this court stated the rights of an upland owner with respect to access to navigable waters too broadly. The decision could be construed as recognizing a right to dredge equivalent to the right to wharf out to navigability. In remitting the matter the Appellate Division relied, inter alia, upon Hedges v West Shore R. R. Co. (150 NY 150).
In Hedges (supra), to land on the west shore of the Hudson River which he already owned, Charles Hedges joined certain lands under water and adjacent to his property which he purchased from the State. He filled the land and constructed a facility for making bricks. At. the time of Hedges’ purchase the New York Central was already operating a railroad along the west shore line of the Hudson River on a right of way leased from defendant West Shore Railroad Company. Hedges’ property was located at a point where a stream known as Murderers’ Creek flowed into the Hudson from the west. In addition to land it already owned from a private grantor, the railroad had acquired, through the State, a strip of land 99 feet wide across the mouth of Murderers’ Creek upon which it constructed a pile bridge. Hedges shipped bricks using the railroad and also by boat utilizing a dock which was constructed to the east side of the railroad’s pile bridge and separated from it by a 100-foot space belonging to the State. “In the natural condition of things * * * and at the time of the construction of the railroad, the waters of the river at this point were quite shallow, and navigable only with small boats, and it is found that at these times there was no place in the river between the plaintiffs’ grant and the railroad structure, and within several hundred feet outside or easterly of it, where there was water enough to float the barges or vessels * * * which the plaintiffs have now in use in their business.” (Hedges v West Shore R. R. Co., 150 NY 150, 154.) With the railroad bridge already in place, Hedges began to dig a canal 10 feet deep and 30 feet wide from his property easterly toward the pile bridge where he was obliged *1031 to stop. He then constructed a causeway and car track under the pile bridge and across the State property to the dock to facilitate transport of bricks via the river utilizing the dock. Plaintiff Hedges claimed that the pile bridge interfered with his right of access to the river. The Court found that the bridge had been constructed to preserve a passage way 14 feet wide with a clearance of eight feet at high water. It held that, “So long as the natural condition of things is left practically unchanged and opportunity afforded at all times for reasonable modes of access, the owner of the lands upon the shore has no just grounds of complaint.” (Hedges v West Shore E. E. Co., 150 NY 150, 158.)
In the instant case, there was no direct testimony of the circumstances which existed in 1929 or the depth of water in the berths of the pre-1952 dock. There is no evidence of dredging prior to 1966 and uncontradicted evidence that barges used both basins until recently. Even if doubt is put aside as to whether the presumption of continuance “flows backward” (Prince, Richardson on Evidence § 3-122 [Farrell 11th ed]; but see, Fisch, New York Evidence § 208 [2d ed]), the fact that dredging has been necessary at intervals since 1966 to maintain á depth of 12 to 14 feet below mean low water does not tend to prove that dredging was necessary to establish such depths in 1952 when the current pier was constructed or at any earlier time. The evidence establishes that the dredging is necessitated by shoaling the deposit of silt from White’s Creek which borders Commander Oil’s property on the south. Whether and to what extent silt might be deposited by White’s Creek in its primordial condition as a tidal estuary is perhaps unascertainable, but it is currently, and for an unspecified period of time has been, incorporated by the Town of Oyster Bay in its storm water runoff system increasing the deposits of silt. Similarly the sand spit to the south and west of the Commander Oil property which was of concern to the Army Corps of Engineers in requiring reduction in the dredging of the east basin is augmented by a storm water runoff system created and maintained by the State of New York. The court finds that in its natural condition prior to dredging and the augmented deposit of silt attributable to the Town and State storm water runoff systems both basins of the dock were usable for tying up barges and offloading oil.
The Coastal Management Plan Staff related its recommendation for Town approval to the issue of the necessity for Commander Oil to utilize the east basin. The evidence was equivo *1032 cal as to whether Commander Oil requires access to both berths in order to remain economically viable as an oil storage facility. However, the testimony offered by Commander Oil that use of the east basin for tying up barges lessened the risk of an oil spill during a northeaster, common storms during certain seasons, was unchallenged and uncontradicted. The administrative agencies with presumed expertise in this area seemed to attempt to strike a balance between the need to use the east basin and the desire to minimize dredging when they required Commander Oil to scale back the proposed dredging. On a preponderance of the evidence the court finds that the modified dredging of the east basin is reasonably necessary to assure safe and economical use of the dock and Commander Oil’s property.
The Town offered into evidence its flood damage prevention ordinance. It also called as a witness John Ellsworth, an environmentalist and consultant to the Town, who testified that the proposed dredging might have an effect on wave energy. However, in its complaint the Town contended that its permission to dredge was needed because of its property rights in the land under Oyster Bay and condition 3 of the Coastal Management Plan Staff’s recommendation. No claim was made with respect to the flood damage prevention ordinance. Indeed, in point III of its appellate brief the Town stated: “The town does have local Flood Plain regulations authorized by Federal government [sic], which review dredging activities that take place in a flood plain area. To date, commander has not applied for a permit to construct (dredge) in a flood hazard area and, therefore, the local flood plain legislation is not an issue before the Court.” (Brief for plaintiff-appellant, at 14.) Under these circumstances any determination with respect to the applicability of the Town’s flood damage prevention ordinance would be in the nature of declaratory relief which was never sought and not pleaded (CPLR 3017 [b]).
The Town’s application for a permanent injunction is denied.