In the Matter of COUNTRY KNOLLS WATER WORKS, INC., Petitioner, v OGDEN REID, as Commissioner of the Department of Environmental Conservation, Respondent.

Third Department, May 27, 1976

*Carola, Doran, Grogan & Heggen (Edward J. Grogan* of counsel), for petitioner.

*Louis J. Lefkowitz, Attorney-General (Julius Feinstein, Ruth Kessler Toch* and *Stanley Fishman* of counsel), for respondent.

KOREMAN, P. J. Petitioner, a privately owned water supplier, made application to the Department of Environmental Conservation for approval of its plans to extend its water supply and distribution system into an enlargement of its service area consisting of some 4,200 acres, to acquire the sources of water supply and distribution system of another corporation, and to develop two new wells as additional sources of water supply for the enlarged system.

The crux of the application was for the approval of two new wells, Nadue and Plank Road; the former well to operate at 300 gallons per minute (gpm), and the latter well to be operated at 800 gpm. The application was made under section 15-1503 *et seq.* of the Environmental Conservation Law.

The Village of Round Lake objected to petitioner's proposed plans on the grounds that inadequate information was available concerning what effect the development of the Nadue well would have on Round Lake or the effect the construction of the transmission main from the Nadue site to the existing distribution system would have on the village or its residents. Individual objectors contended that water pressure in the petitioner's system presently is inadequate and that extension of the system would lower system pressures further.

The New York State Public Service Commission and Health Department contend that petitioner has not demonstrated that a sufficient quantity of water is available to meet projected demands, that sufficient storage has been provided to supply water at a proper pressure throughout the combined service area, or that definite plans for the utilization of the Nadue water source have been established. A public hearing was held on November 6, 1974, and the final decision was made September 8, 1975.

Although the petitioner lays out three distinct challenges in its brief, they all depend on its basic argument that the decision being challenged is not based on substantial evidence. In reviewing the determination of the department, this court

should not review the facts generally, except to find substantial evidence *(Matter of Pell v Board of Educ. of Union Free School Dist., No. 1 of Towns of Scarsdale & Mamaroneck,* 34 NY2d 222). "Rationality is what is reviewed under both the substantial evidence rule and the arbitrary and capricious standard" *(id.* p 231).

The petitioner in its brief specified those conclusions and recommendations that it claims are not supported by substantial evidence. These conclusions can be categorized by subject matter as follows: the Plank Road well (Decision of Department, conclusions Nos. 2, 3, 10 [B], 10 [D]); the Nadue well (conclusion No. 5); storage capacity (conclusions Nos. 6, 10 [E]); pipe and pressure requirements (conclusions Nos. 7, 10 [F]); ownership and control (conclusion No. 10 [I]).

The petitioner sought approval of an 800-gallon-per-minute (gpm) well off Plank Road and was given authority to construct such a well but was limited to pumping at a rate of 300 gpm until such time as departmentally approved pumping tests could demonstrate a higher capacity and until plans were submitted for sand removal and equipment therefor was installed. The department found that the well was presently being pumped at between 100 and 300 gpm and that at a pumping rate in excess of 500 gpm, sand could be drawn into the system. The consulting engineer for the petitioner testified that there is a sand problem at the Plank Road well and stated: "I could say further that at the rates that we are now using the well [100 to 300 gpm] sand is certainly not a problem." He testified also that the actual determination of whether sand removal is required at the Plank Road well could only be made "sometime during peak drafts, perhaps next watering season". The professional engineer of the Department of Health expressed concern with petitioner's failure to comply with the test suggested and the conclusion of petitioner's expert that the well should be run for extended use at only 500 gpm. With such evidence in the record, the department acted in a reasonable and prudent manner to protect the public interest when it concluded that since the Plank Road well "is subject to possible sand infiltration at higher rates of pumping", it must be "restricted to the present rate of 300 gpm until further information is provided to substantiate higher pumping rates or definite plans for sand removal are submitted to the Department". The modification of petitioner's application in this respect was based upon

competent, material evidence which is substantial in view of the entire record. (ECL 15-0903, subd 2, par j.) Because of the uncertainty of sand infiltration, the department was justified in limiting the present output of the well (and incidently the number of authorized customers) until further information is provided and plans are submitted. Accordingly, the conclusions in the decision of the department designated 2, 3, 10 [B], and 10 [D] are affirmed.

Petitioner's contention that there was no substantial evidence to support the department's disapproval of the Nadue well at this time is without merit. Petitioner does not challenge the finding that the proposed use of this site is 8 to 10 years in the future. The complaint seems to be that petitioner has been denied approval to further develop the Nadue site. Given the fact that the supply will not be actually used for another 8 to 10 years, the request for approval was premature. Those considerations which the department was required to take into account (ECL 15-1503) were not available. We conclude that the permission contained in the department's decision to "continue to explore the potential yield of the Nadue site" was based on substantial evidence, and enables the petitioner to do all that the department is authorized to allow at this time. (See *Matter of Ton-Da-Lay v Diamond,* 44 AD2d 430, app dsmd 35 NY2d 789, mot for lv to app dsmd 36 NY2d 856.) Since petitioner does not propose to develop this source in the immediate future, its utilization is not justified by public necessity at this time. Accordingly, conclusion No. 5 is affirmed.

Petitioner's contention that the department's requirements respecting adequate storage supply and a specific storage capacity are not supported by substantial evidence, and that the department has no authority in this regard cannot be sustained. That the department has the authority and the duty to consider whether a proposed water system provides for an adequate supply is clear from the statutes (ECL 15-1503, subd 4 and the regulations (see, e.g., 6 NYCRR 601.7 [f]; 601.14; 601.25 [d]). It would appear logical that authority to require a reasonable level of water storage capacity is included. The department, in determining the quantity of storage required, points to the State Sanitary Code (10 NYCRR 74.5 [b] [4]) which states: "Community water systems shall have at least one day's available storage at design average consumption." While there is substantial evidence in the

record concerning existing problems of inadequate service and continuing restrictions on water use, we conclude that it was unreasonable for the department to require storage based upon *peak* demand, rather than design average consumption. It appears that this result came about because the department took as its storage requirement petitioner's figure of 660 gallons per day per service which was based on a 5-day average *peak* demand during the summer of 1973. This figure was used by petitioner, not to determine storage requirements but rather to determine the maximum daily pumping requirements of his system.

While a definition of "design average consumption" does not appear in either the statute or the regulations, it would seem obvious that "peak" consumption is far from identical to "average" consumption. There is no basis in the testimony or the regulations for the department to require minimum storage for each customer of one day's peak consumption. The department was arbitrary in so requiring. This conclusion is further supported by the fact that the department found that the existing licensed system has far less than the minimum storage capacity. Because they are not based on substantial evidence, conclusions No. 6 and No. 10 [E] must be reversed. As there was no testimony concerning "design average consumption", these issues must be remanded for fact-finding.

The petitioner next challenges the requirements that one-inch pipe be provided "[t]hroughout the service areas herein authorized", that minimum water pressure in excess of 20 pounds per square inch (psi) be provided to customers, and that an auxiliary power source be provided within one year.

From the record it seems clear that because of the expanse of petitioner's distribution system and the higher elevations thereof, utilization of one-inch service is necessary to insure adequate water pressure. A senior water supply engineer of the department testified that the provision for such a service line is a reasonable requirement. He stated: "It is not a big economic expense and it would lessen pressure problems on the system. If the larger service lines are used, there is less of a friction loss in the service line and, therefore, the lower pressure in the main could be tolerated, so that would appear to be a reasonable recommendation." A witness on behalf of the New York State Public Service Commission testified that the petitioner had committed itself to installing all new services at minimum inside diameter of one inch. Petitioner

has raised the issue that it should not be required to install one-inch pipe "throughout the system". From the language of the decision of the department (conclusion No. 10 [F]) and the scope of this proceeding, we conclude that one-inch pipe need only be used for services in addition to those presently existing. Petitioner also questions whether the one-inch service is required for all additional connections or whether this was meant only for those customers above 370 feet. We conclude that the requirement refers to the *new* system. There is substantial evidence for this requirement. In an engineering study prepared by the Department of Public Service (Exhibit 17), it is stated with reference to service line sizing: "All future service lines installed should be of minimum one-inch size to eliminate excessive service line pressure losses, particularly at the higher elevation area."

The petitioner's challenge to the 20 psi requirement appears to be based on a semantic distinction. The petitioner contends that this pressure should only be required "in the distribution system not in the customer's own system". The department contends that this pressure should be maintained at least up to "the meter in the customer's house, rather than it ending in the distribution system". The decision states that this pressure "shall be provided to customers at all times." The Health Department Regulations require "a minimum working pressure of 20 pounds per square inch under all flow requirements of the distribution system" (10 NYCRR 5-1.32).

The distinction between these various statements is not at all clear. It does not appear that there is a substantial difference between the positions urged by the parties. Clearly, the petitioner cannot be required to maintain 20 psi throughout the consumer's system. It would seem that the department's conclusion and the regulation require the petitioner to provide 20 psi to the customer. At what point this pressure should be measured is not an issue in this case because the department's decision does not so specify.

The petitioner also contends that there is no evidence at any point in the record of the need for a booster pump. There was testimony by two witnesses, one for the Public Service Commission, and one for the Department of Health, concerning the need for pressure boosting. Accordingly, since there was substantial evidence to support the requirements contained therein, conclusion No. 10 [F] must be affirmed.

The petitioner finally challenges conclusion No. 10 [I] that requires the petitioner to retain ownership of the land within 100 feet of the wells and to maintain control of the land within 200 feet to protect the wells from pollution. The petitioner contends that it does not own all the land within 100 feet of the Plank Road well and could not control the land within 200 feet. It claims that this is because of an adjacent town road. Beyond this bald statement of fact, the petitioner does not indicate its basis for challenging this recommendation.

The department states in its brief, and the record indicates, that the petitioner would own within 100 feet and control up to 150 feet if the town road were included as lands owned and controlled. The department states that this is in fact its policy. This apparently leaves some 50 feet that the petitioner does not presently control. The petitioner does not indicate why it could not obtain control of this 50 feet. If it is impossible for it to obtain such control, it would apparently be possible for it to apply for a modification of this decision.

The department is empowered to require this ownership and control to assure "the proper protection of the supply and the watershed from contamination" (ECL 15-1503, subd 4), and these requirements would seem to be reasonable (10 NYCRR 5-2.8 [h] [i]). Conclusion No. 10 [I] should therefore be affirmed.

Petitioner's further argument that it was denied due process is without merit. The argument is based on the premise that "at no point in the hearing was evidence adduced supporting the respondent's conclusions". With the exceptions above noted, there was substantial evidence supporting the department's conclusion and, thus, the petitioner was not denied due process.

The remainder of petitioner's contentions, although phrased in different terms, all concern the substantial evidence question.

The determination should be modified by reversing conclusions Nos. 6 and 10 [E]; matter remitted for a further hearing on these issues, and, as so modified, the determination should be confirmed, without costs.

SWEENEY, KANE, MAHONEY and LARKIN, JJ., concur.

Determination modified by reversing conclusions Nos. 6 and

10 [E]; matter remitted for a further hearing on these issues, and so modified, determination confirmed, without costs.