In the Matter of HUDSON RIVER FISHERMAN'S ASSOCIATION et al., Petitioners, v HENRY G. WILLIAMS, as Commissioner of the New York State Department of Environmental Conservation, et al., Respondents.

Third Department, July 21, 1988

**APPEARANCES OF COUNSEL**

*Paul, Weiss, Rifkind, Wharton & Garrison (David G. Bookbinder* and *George P. Felleman* of counsel), for petitioners.

*Robert Abrams, Attorney-General (Maria Semidei-Otero, Lawrence A. Rappoport, Peter H. Schiff* and *Douglas H. Ward* of counsel), for Henry G. Williams and another, respondents.

*DeForest & Duer (Robert L. Duncan* and *Veronica A. Perry* of counsel), for Spring Valley Water Company, Incorporated, respondent.

**OPINION OF THE COURT**

YESAWICH, JR., J.

Respondent Spring Valley Water Company, Inc. (hereinafter Spring Valley) provides water for approximately 88% of the residents of petitioner Rockland County and various industrial users from four major sources: (1) 57 wells, (2) the Lake De Forest Reservoir and Filter Plant, (3) the Ramapo Valley Well Field, and (4) the Stony Point Reservoir and Filter Plant. In 1979, Spring Valley submitted a water supply application to respondent Department of Environmental Conservation (hereinafter DEC) for permission to construct an additional water source named the Ambrey Pond project on a 364-acre site near the Town of Stony Point, Rockland County, including a reservoir with a nearly two-billion gallon capacity, a filtration plant, and a diversion pipeline to bring water to the reservoir from a nearby brook; acquisition of land to construct the reservoir and filtration plant is contemplated by the first stage of this multistage undertaking. The project, capable of adding a dependable yield of approximately 7.5 million gallons per day (mgd) to the utility's water distribution capacity, was sought to meet three perceived needs: (1) a present water supply deficit in the Haverstraw-Stony Point area of the Spring Valley system that is currently being met with releases of water from Lake Tiorati, pursuant to an agreement with the Palisades Interstate Park Commission, a circumstance which is not expected to continue, and by pumping water from lower elevations in the system at a substantial cost; (2) an anticipated inability to meet peak demand[1] throughout the system in the short-term future; and (3) a

---

1. "Peak demand" is the largest volume of water that is necessary in a single day during a year to meet both metered water use and unaccounted for water.

projected system-wide inability to meet average demand[2] further into the future. A primary factor requiring a new supply is the growth of Rockland County's population, though other factors include the contamination of six wells, the antiquation of the Stony Point treatment facility, the unavailability of water from the Ramapo Valley Well Field during periods of drought, and the aforementioned loss of water supply from Lake Tiorati.

During the course of extensive hearings, the inevitability of the need for an additional water supply became obvious; there was, however, a great deal of disagreement as to when this need would become manifest. The inherent uncertainty in determining precisely when the project would be necessary prompted Spring Valley and the Department of Public Service, which had expressed interest in increasing the peaking capacity of Spring Valley's system, to suggest that a "trigger mechanism" tying the date of the project's implementation to the demand for water be utilized. So that preliminary steps could be taken without authorizing premature construction and yet avoid a redundant new hearing which might perilously delay development of the proposed water supply, respondent Commissioner of Environmental Conservation (hereinafter the Commissioner) approved the project but "triggered" issuance of construction permits upon Spring Valley's experiencing an average demand of 27.9 mgd for two consecutive years. Although Spring Valley expects to reach its maximum peak demand capacity well before it approaches the limit of its average demand capacity, the "trigger mechanism" was linked to the average demand because it more accurately reflects the relatively smooth trend of increased demand than the erratic peak demand which is heavily influenced by such vagaries as the weather. The point at which Spring Valley's current peak demand capacity would be exhausted was approximated by divining an appropriate ratio between average and peak demands to determine at which average demand level the peak demand capacity would be exhausted; that average demand figure was then adjusted downwards to allow for the 3 to 4 years' construction time required for the project. A regrettable and apparently inescapable consequence of the Ambrey Pond project is the likely destruction of a major naturally reproducing trout population due to the diversion of

2. "Average demand" is the yearly amount of water pumped into the distribution system divided by the number of days in the year.

most of the flow from Rockland County's best trout stream into the Ambrey Pond Reservoir.

Following adoption of the Administrative Law Judge's conditional approval of the Ambrey Pond project by the Commissioner, petitioners in two separate CPLR article 78 proceedings challenged the Commissioner's determination as arbitrary and capricious, as an unlawful delegation of legislative authority to a private utility, and as being violative of the State Environmental Quality Review Act (hereinafter SEQRA) (ECL art 8). Supreme Court consolidated the proceedings and transferred them to this court.

■ Initially, we point out that the consolidated proceeding was improperly transferred. Where an administrative agency takes action as a result of an adjudicatory hearing, judicial review is sought by way of a CPLR article 78 proceeding in the nature of certiorari (CPLR 7803 [4]). If the agency's findings of fact are challenged, the standard of review is the familiar substantial evidence test, and, where that issue is raised, the proceeding must be transferred to this court (CPLR 7804 [g]). However, where agency action is taken without a hearing, or where the hearing is discretionary or informational as opposed to adjudicatory and evidentiary such that the agency is acting in a legislative or rule-making role, judicial review is sought by way of a CPLR article 78 proceeding in the nature of mandamus to review (CPLR 7803 [3]). In such case, the standard of review is whether the agency's action had a rational basis and, thus, was not arbitrary or capricious. As a result, the substantial evidence test is not at issue and transfer to this court is not authorized *(Matter of Department of Envtl. Protection v Department of Envtl. Conservation,* 120 AD2d 166, 169, *lv denied* 69 NY2d 921; *Matter of Incorporated Vil. of Val. Stream v State of New York Pub. Serv. Commn.,* 107 AD2d 856, 857; *Matter of Save the Pine Bush v Planning Bd.,* 83 AD2d 741, 742).* In this case, the hearing conducted was not adjudicatory or quasi-judicial, but was informational *(see, e.g., Matter of Save the Pine Bush v Planning Bd., supra).* Thus, transfer to this court was inappropriate. However, in the interest of conservation of judicial resources, we choose to entertain the proceeding *(see,* CPLR 7804 [g]; *Matter of Incorporated Vil. of Val. Stream v State of New York. Pub. Serv. Commn., supra).*

■ Petitioners argue initially that Spring Valley failed to demonstrate the "public necessity" which ECL 15-1503 (2) requires as a precondition to construction of a water supply

project. Citing *Matter of Country Knolls Water Works v Reid* (52 AD2d 284), they assert that because Spring Valley concedes that it does not have a present need for which the proposed source will be developed in the "immediate future", the application should have been denied *(see, supra,* at 288). This argument is flawed in several respects. First, ECL 15-1503 (2) authorizes the granting of permits based on a number of factors including "future needs for sources of water supply". It is also important to note the posture of the *Country Knolls* case. There we held that the DEC could deny a permit because a present need was not sufficiently shown; we did not concomitantly hold that the DEC must wait for the need to become dire and then only issue permits belatedly. Second, aside from the present water supply deficit in the Haverstraw-Stony Point area, there is substantial evidence of an unavoidable, if not imminent, necessity for greater peak demand capacity. Third, the trigger mechanism itself insures that the construction permits will not be issued until the need for an expanded water supply is close at hand, at least to the extent that such a demand can be foretold. The time required to construct dams, a filtration plant and a diversion pipeline necessitates that some sort of predictive mechanism be used. Given the many variables affecting the demand for water, it is hardly surprising that there was great divergence in the trigger proposals advanced by the various parties or that the figures relied upon have changed over the course of the long application process. Nevertheless, this does not equate to a showing of irrationality for the Commissioner's decision to conditionally authorize the project *(see, Matter of Spring Val. Water Works & Supply Co. v Wilm,* 14 AD2d 658, 659).

█ Petitioners maintain further that the Commissioner's choice of the crucial 27.9 mgd trigger which actuates the process for issuing the construction permits was irrational; specifically that there is no historical foundation for relying on average demand to forecast peak demand. Reliance on average demand is undeniably a logical indicator here because of its stability and, though not faultlessly predictive of peak demand, the ratio between the two has remained between 1.4 and 1.9, thus providing the Commissioner with a rational and not unreasonable means of judging when to authorize additional water supply construction *(see, Town of Hempstead v Flacke,* 82 AD2d 183, 189).

We feel obliged to caution DEC, and Administrative Law Judges generally, to heed our concern that the basis for their

core determinations be suitably explained *(see, Matter of Niagara Mohawk Power Corp. v Public Serv. Commn.,* 138 AD2d 63, 68). Here, for instance, petitioners justifiably complain that the rationale for choosing the figure 27.9 mgd is not fully elucidated. Nonetheless, because the approximate origin for the figure is discernible from the record and well supported therein and since this is a highly technical factor well within the agency's expertise *(see, Matter of Rella v Berle,* 59 AD2d 56, 60, *lv denied* 43 NY2d 648), a remittal for elaboration is not appropriate in this instance. Viewed in the context of the problems facing Spring Valley and considering that the basic dispute is one of timing, the trigger mechanism was a particularly apt resolution, for it postpones costly construction if the water demand does not grow as expected while allowing Spring Valley to acquire property in the inevitable reservoir basin, and yet allows it adequate time to construct the project when the demand for water begins pressing the limits of the existing system.

■ In another attack on the trigger mechanism, petitioners assert that resorting to its use constitutes an illegal delegation by the Commissioner of legislative authority from DEC to Spring Valley *(see generally, Matter of Fink v Cole,* 302 NY 216, 225) in that Spring Valley can now elect when it will receive construction permits. This misperceives conditioned approval. Implicit in the power to impose conditions on the issuance of a permit *(see,* ECL 15-1503 [3]; *see, e.g., Matter of Flynn v Flacke,* 87 AD2d 930) is the authority and obligation to insure that the conditions are met. Petitioners' concern that the absence of an expiration date will allow issuance of construction permits even though circumstances have changed appreciably is unfounded. DEC may modify, suspend or revoke a permit based upon new information (6 NYCRR 621.13 [a] [4]). Permit approval being conditional, the Commissioner has necessarily reserved the right to review the prior approval, albeit with a predisposition toward approval. Also unduly immoderate is petitioners' fear that Spring Valley, to reach the trigger point, will engage in wasteful practices or at the very least not encourage conservation. We are not disposed to assume that the Public Service Commission will fail to fulfill its responsibility of preventing such conduct *(see,* Public Service Law § 89-c [2], [15]). Furthermore, it is inconceivable that DEC would issue the permits if wasteful practices were discovered.

■ The last of petitioners' arguments, which though lacking

in merit calls for comment, is their contention that compliance was not had with SEQRA. The fact that Spring Valley's offer to mitigate the damage to the trout stream by increasing the flow past its diversion structure from 0.3 mgd to 0.8 mgd was not given consideration in the final environmental impact statement is understandable inasmuch as there was expert testimony that a stream flow of 7.3 mgd was essential to sustain the trout. A flow of that level would effectively subvert the project. In light of the high priority of domestic and municipal water uses *(see,* ECL 15-0105 [5]; *see also,* ECL 8-0103 [7]), the trout stream must unfortunately give way to the predictable and unrelenting growth in human water demands.

MAHONEY, P. J., CASEY, LEVINE and MERCURE, JJ., concur.

Determination confirmed, and petition dismissed, with costs.