[752 NYS2d 326]

In the Matter of JOHN F. POSTER, Appellant, v SCOTT A. STROUGH, as President of the Board of Trustees of the Freeholders and Commonalty of the Town of Southampton, et al., Respondents.

Second Department, October 15, 2002

APPEARANCES OF COUNSEL

*Anthony B. Tohill, P.C.,* Riverhead, for appellant.

*Ahmuty, Demers & McManus,* Albertson (*Neil H. Angel* of counsel), for respondents.

### OPINION OF THE COURT

PRUDENTI, P.J.

In the case under review on this appeal, and in a case involving a neighboring property (*see Matter of Allen v Strough,* 301 AD2d 11 [decided herewith]), the Board of Trustees of the Freeholders and Commonalty of the Town of Southampton (hereinafter the Board) prohibited two owners of beachfront properties from erecting rock revetments intended to protect their homes from the threat of eventual destruction posed both by the inevitable effects of beach erosion and by the potential effects of possible future storms. The Board asserts that its determination was based on the probability that such revetments would exacerbate the effects of beach erosion on other properties, to the detriment of the overall community. The primary questions on this appeal are whether the Board acted within its jurisdiction in prohibiting the proposed revetment and whether the Board's action was arbitrary, capricious, or irrational.

Over past decades, the shoreline in the Southampton area has, according to one report, ineluctably moved landward at an average rate of one foot to seven feet per year. The owners of beachfront homes in Southampton have a critical interest in combating the effects of this trend in the area immediately adjoining their properties. As between (1) "retreat," that is, the landward relocation of their homes, (2) "soft stabilization," that is, the renourishment of the surrounding beach and the replenishment of the dunes, and (3) "hard stabilization," that is, the "armoring" of beaches with "hard structures" designed to dissipate wave energy or to trap sand and widen beaches,

such homeowners may see the last option as being the only one that is at once effective, at least in the short term, and economically feasible. However, the possibility that the "hard stabilization" approach, while temporarily allaying the concerns of particular homeowners, might simultaneously accelerate the natural long-term process by which the beaches of Southampton, and of southern Long Island in general, are being narrowed and brought closer to destruction, has created a dilemma for government agencies answerable both to homeowners and to recreational beach users.

In the present case, John F. Poster applied for a permit for the construction of a "sloping rock revetment" in order to protect his oceanfront home. The record on appeal in Allen reveals that Poster's house is in fact the "gatehouse" to an "old house [that] got wiped out in the '38 hurricane." The proposed revetment was to measure 144 feet by 28 feet, and was to join a similar revetment which Poster's neighbor to the east, Susan Allen, also proposed to build (*see Allen*). The revetment would consist of three layers: (1) a filter fabric liner, (2) a two-foot layer of 200 to 1,000 hundred-pound core stones, and (3) a top layer of five- to nine-ton armor stones. The revetment was to be built in conjunction with a dune restoration project consisting of the placement of approximately 3,000 cubic yards of sand over the revetment and the planting of beach grass.

On April 5, 1999, the Board denied Poster's application, just as it had denied the similar application of Susan Allen in November 1998 (*see Allen*). In its resolution denying Poster's application, the Board stated that it had considered "the potential adverse impacts to both the environment and the rights and resources of the [public], including whether the proposed activity applied for will unreasonably interfere with the rights of the [public] to use their lands or to pass and repass along their rights of way." The Board also stated that any grant of the permit requested would be "inconsistent with the [Board's] current policy towards such hard structures and would be detrimental to adjacent property owners."

By notice of petition, summons, and "petition-complaint," all dated July 15, 1999, Poster commenced the present hybrid proceeding and action against the Board. In the proceeding-action, Poster seeks (1) a judgment annulling the Board's determination dated April 5, 1999, and compelling the Board to grant his application for permission to construct the revetment on his property, (2) a judgment declaring that the Board's action constituted a "taking" of his property in violation of the

State and Federal Constitutions, and (3) a money judgment in the sum of $10,000,000, and an award of an attorney's fee pursuant to 42 USC § 1983.

It should be noted that at the time this hybrid proceeding-action was commenced, Poster's attorney, Anthony Tohill, Esq., was also representing Susan Allen, Poster's neighbor to the east, in connection with her pending hybrid proceeding and action against the Board in which she was seeking similar relief. It appears that Tohill also represents or represented several similarly-situated homeowners whose properties were allegedly placed in peril as the result of storms which occurred in January and February 1998.

In support of his demand for relief, Poster asserted that he is the owner of a house designated as 328 Gin Lane in Southampton, which is located on a lot that is bounded on the south by the Atlantic Ocean. Poster alleged that, since 1998, his property has undergone "extraordinary" erosion, that the dune which had stood between the ocean and his house had essentially disappeared, and that the eroded area of the beachfront had come to within "a few feet" of his house, placing it at risk of collapse at some point in the future.

Poster alleged that the Board denied his application for a revetment permit despite evidence showing that the area in which the revetment was to be placed was on property beyond the Board's territorial jurisdiction. He alleged that the Board's action was arbitrary, and hence subject to vacatur in a proceeding pursuant to CPLR article 78, in that it was made "without any evidence whatsoever in the record [to support] a finding * * * that the proposed revetment was within the territorial jurisdiction of [the Board]." He also alleged that there was no substantial evidence to support the determination that the revetment would "interfere with any public right to pass and repass along the shore of the Atlantic Ocean or that such revetment will cause environmental damage."

In support of his "taking" claim, Poster asserted that the resolution of the Board dated April 5, 1999, effectively took his property without just compensation in violation of the Due Process Clauses of the State and Federal Constitutions. He asserted that the resolution in effect deprived him of the use and enjoyment of his property, which, without the revetment, was at the mercy of "storms and tidal forces." He also asserted that his right of equal protection had been violated because the Board had allowed other similarly-situated persons to construct such revetments. In support of his claim based on 42 USC

§ 1983, Poster asserted that the Board, acting under color of state law, had committed the due process and equal protection violations noted above.

The Board submitted an answer dated October 29, 1999, and the affidavit of its president, Scott A. Strough, sworn to October 27, 1999. Strough asserted that the Board's authorization was required prior to the erection of the proposed revetment pursuant to the "Rules and Regulations for the Management and Products of the Waters of the Town of Southampton" (hereinafter the Rules), article VII, § 1 (A) (3), and pursuant to Code of the Town of Southampton (hereinafter the Town Code), article VI, § 111-30. In addition, he asserted, "Article II, Section 49-6 of the Code of the Village of Southampton [hereinafter the Village Code] has designated the area that includes Poster's house to be a Coastal Erosion Hazard Zone."

According to Strough, the record before the Board consisted of Poster's permit application, and the Board's resolution denying that application. He asserted that "there were no evidentiary hearings * * * because the Board had recently held such hearings on the application of Poster's neighbor, Susan Allen, as well as [on that of] other residents of the Town for permits to construct the exact same types of revetment structures" (see Allen). He stated that the remainder of his affidavit would deal with the reasons why, in general, the Board denies such applications.

Strough asserted that the Board had "amassed a considerable volume of experience and expertise in [its] efforts to minimize the loss of beach area to the Atlantic Ocean and [to] preserve this priceless natural resource for future generations." He annexed to his affidavit a copy of a report to the Legislature of the State of New York dating from February 15, 1945. This report graphically illustrated the geographical metamorphosis which the southern coast of Long Island, from Coney Island to Montauk Point, had undergone over the course of preceding decades, both imperceptibly over time as the result of inevitable erosion and more sporadically, and more dramatically, as the result of prior storms and hurricanes. This report warned that the state's "heritage along the ocean" was at risk of eventual destruction. The report noted that a comprehensive plan was essential, and that the erection of "erosion arresting structures" by individuals or communities out of their anxiety to protect their own properties might only aggravate the damage done to neighboring properties. In regard to various properties in Southampton, this report indicated that the bulkheads

which were then being erected were often ineffective and, in many cases, did "more harm than good."

Mr. Strough also referred to an article entitled "Probable Effects of a Storm Like Hurricane Hugo on Long Island, New York," which was published in 1990 in volume 9, number $1/2$, in the journal Northeastern Environmental Science. The authors of this article, applying what lessons could be learned from the occurrence of Hurricane Hugo, which struck South Carolina in 1989, and which was similar to a New England hurricane which, in 1938, had devastated areas of a then much more sparsely-populated Long Island, issued dire warnings concerning the effects a similar hurricane would have on Long Island today. Among other things, the authors recommended maximizing the width of Long Island's barrier beaches, a goal which would be promoted by removal or shortening of existing groins and jetties, and by a moratorium on the construction or extension of such structures.

Strough also produced a copy of an expert report prepared for the Town of Southampton in 1997, entitled "The Effects of Shoreline Hardening on the South Shore of New York," which focused on 47.4 miles of coast running east of Moriches inlet. This report describes in great scientific detail how the effectiveness of "hard structures" (e.g., rock jetties, rock and timber groins, seawalls, steel and timber bulkheads, rock revetments) in shielding private homes or other properties from the natural consequences of erosion necessarily comes at the expense of the broader interest that the public has in preserving recreational beaches. The author of the report concluded that beaches in front of exposed seawalls or downdrift of groins or jetties were significantly narrower than "unarmored" beaches, beaches in front of seawalls buried under dunes, and beaches updrift of groins and jetties.

The Strough affidavit is also supported by a series of photographs which depict a seawall built in 1936 in order to protect the property of Carl Spielvogel (hereinafter the Spielvogel house), located east of the house of Susan Allen (*see Allen*). That seawall was buried under sand and beach grass at the Board's insistence in 1995; however, by 1998, the material under which the seawall had been buried had already washed away, the seawall was again exposed, and no beach area at all remained in front of the seawall at high tide. Conceding that the measures taken to protect the Spielvogel house aggravated the erosion of the beach in front of Poster's house, as well as the erosion of the beach in front of Allen's home, and express-

ing sympathy with Poster's plight, Strough asserted that if Poster were permitted to build his proposed revetment, that measure would aggravate the erosion of the beach on the property to the west of Poster's, and that if the owner of that property were permitted to build a similar structure, that measure would aggravate the erosion on the beach of the property located further west. This, according to Strough, would result in vast east-to-west "domino effect" which would eventually result in the "hardening" of all of Southampton's coast, and in the destruction of Southampton's beaches.

Strough, citing portions of the documents submitted by Poster together with his permit application, also asserted that Poster's house was 150 feet from the average high water mark, so that, according to the documents submitted to the Board, Poster was not confronting an emergency situation.

In a reply affirmation, Poster's attorney argued that all of the scientific data submitted in the Strough affidavit, described above, was "dehors the record," in that it was not introduced into evidence in any proceeding before the Board. Counsel argued that the only evidence before the Board was the permit application itself. Counsel conceded that the Board did not hold a hearing prior to its denial of Poster's application. Counsel did not assert that the law required a hearing before the Board.

Referring to a site plan submitted with the application, counsel asserted that the proposed revetment was to be constructed landward (north) of a line designated as "top of dune 9/26/94," which represents the crest of the dune that existed prior to the erosion described in Poster's petition-complaint. This site plan also depicts a line to the north of the proposed revetment, reflecting the "top of erosion scarp 10/22/98." Counsel argued that, pursuant to governing regulations and local laws, the Board had no jurisdiction over the area landward (north) of the line which reflected the top of the dune as of September 26, 1994. Counsel therefore asserted that the Supreme Court should either annul the determination on jurisdictional grounds, or direct a hearing on the issue of whether the Board had jurisdiction (see CPLR 7804 [h]).

In a further affirmation, counsel for the Board conceded that it was correct that the scientific data submitted to the court in answer to the petition-complaint had not been introduced in evidence before the Board, but noted that the reason for this was that there was no hearing before the Board at all. Counsel noted that the Board had already held public hearings in con-

nection with its review of similar applications, including that of Poster's neighbor to the east (see *Allen*). Counsel clarified that the Board was seeking not only dismissal of the CPLR article 78 portion of the hybrid proceeding-action, but dismissal of Poster's claims based on 42 USC § 1983 and based on the alleged regulatory "taking" (see CPLR 3212, 3211 [a] [7]).

By order dated March 30, 2000, the Supreme Court directed that the parties would have additional time within which to submit further proof. The court explained that it was making this directive based on its decision to entertain the Board's application to dismiss the entire hybrid proceeding-action, and not merely the CPLR article 78 proceeding portion thereof, and in order to avoid any claim of surprise.

In an affidavit dated April 17, 2000, Poster's attorney repeated his jurisdictional argument. In an affirmation dated April 24, 2000, the Board's attorney repeated several of the Board's arguments.

By decision dated September 12, 2000, the Supreme Court (Underwood, J.) announced its intent to dismiss the hybrid proceeding-action. The Supreme Court held that the Board had jurisdiction under the common law to grant or deny the permit application. The court held that the Board did not act arbitrarily in denying the permit application. The court also held that Poster's interest in having a permit granted was not a "property" interest, and that there was hence no evidence of a violation of 42 USC § 1983 based on a "taking." The Supreme Court also noted that the record was devoid of any evidence that Poster was being treated differently from similarly-situated landowners. A judgment dismissing the petition-complaint was entered October 30, 2000. Poster now appeals.

Poster argues that his proposed revetment would be positioned landward (north) of the line which, on the site plan he submitted together with his application for a permit, traces (from east to west) what once was the "top" of the dune which *used to* exist between his house and the ocean several years before the date of his permit application. He argues that the destruction of this dune in 1998 was the result of "avulsion" so that, pursuant to the rule he derives from *New Jersey v New York* (523 US 767), the line to be considered critical in determining the Board's jurisdiction now that the dune has been destroyed is the same as the line which traced the "top" of the dune as of the last time its crest was measured prior to the dune's destruction.

The Board relies on several cases (*e.g. Tiffany v Town of Oyster Bay*, 234 NY 15; *Roe v Strong*, 107 NY 350; *Trustees of Brookhaven v Strong*, 60 NY 56; *People v Miller*, 235 App Div 226, *affd* 260 NY 585; *Matter of Rottenberg v Edwards*, 103 AD2d 138; *State of New York v Trustees of Freeholders & Commonalty of Town of Southampton*, 99 AD2d 804; *Tucci v Salzhauer*, 40 AD2d 712, *affd* 33 NY2d 854; *Nance v Town of Oyster Bay*, 23 AD2d 9) in support of the propositions that it has "jurisdiction to regulate coastal waters and lands," and that it has the power to protect the easement that exists for the benefit of the public over such coastal land or beaches. The Board also cites Town Code, article VI, § 111-30 (A); Village Code, article II, § 49-6; and Rules, article VII, § 1 (A) (3) as alternative sources for its jurisdiction.

This is not a case in which the Board is seeking an injunction to prohibit interference with the public's right to enjoy the beach, in which the Board would have the burden of proving its entitlement to such relief. Instead, this is a case where the Board has asserted jurisdiction pursuant to certain local laws which confer upon it virtually absolute discretion to grant or deny permits in connection with the proposed construction of defined structures, including revetments, within defined areas, including within the "ocean beach area" (Rules art I). The Board's exercise of its discretion is subject to extremely limited judicial review. The relevant local laws provide as follows:

Town Code, article VI, § 111-30 (A) states, "*No dock, spile, bulkhead, jetty, retaining wall, revetment, catwalk, walkway, stairs, step, artificial beach nourishment or fill, upland retaining wall* or any other structure constructed for the purpose of controlling erosion along a shoreline or constructed for the purpose of providing access to and from the shoreline of any Town waters or trustee waters or *within the* bay beach area or *ocean beach area* as defined in this chapter *shall be constructed or placed thereon* without first obtaining a permit from the Town Trustees" (emphasis supplied).

Rules, article VII, § 1 (A) (3) states, in similar terms, that, unless authorized by a permit issued by the Board, "*no person shall engage in any of the following activities in* Town waters or the bottoms of the Town waters or *the bay beach area or the ocean beach area* as defined herein unless authorized by a permit issued by [the Board] * * * (3) erect, *construct*, reconstruct, alter, enlarge, drive or place *any structure, including* a dock, pile, tie off poles, moorings, or other obstruction, or bulkhead, jetty, retaining wall, groin, *revetment,* rip-rap, ramp,

catwalk, walkway, stairs, steps or any structure constructed for the purpose of controlling erosion along a shoreline or constructed for the purpose of providing access to and from the shoreline" (emphasis supplied).

Rules article I defines the term "ocean beach area" as meaning "all those premises along the Atlantic Ocean bounded *on the north by the crest of the primary dune,* on the east by the East Hampton town line, on the south by the high-water mark of the Atlantic Ocean, and on the west by the Brookhaven town line, including those areas within incorporated villages. Said area shall be the easement held in favor of the Freeholders and Commonalty of the Town of Southampton" (emphasis supplied).

As can be seen, this local legislation is written so as to require permits when homeowners undertake certain projects (including the construction of a revetment) in certain defined areas, including an "ocean beach area" (Rules art I). The "ocean beach area," in turn, is defined by reference to very precise western and eastern borders (the town lines of Brookhaven and East Hampton, respectively,) by reference to a relatively precise southern border (the high water mark of the Atlantic Ocean), and by reference to a northern border which is unfortunately much less precise, that is, "the crest of the primary dune." According to this definition, the northern limit of the Board's authority to regulate revetments in the "ocean beach area" of the town corresponds to the crest of what the governing enactments refer to in the singular as the "primary" dune (Rules art I). There is no evidence in the record as to where this line actually is.

As a source of jurisdiction, the Board also relies on Village Code, article II, § 49-6. However, this reliance is not well founded, for the simple reason that it does not address in any way the powers of the Board, the local government which is claiming the right, in the present case, to pass on Poster's application. This section of the Village Code establishes a "coastal erosion hazard area," as defined by a map prepared by the New York State Department of Environmental Conservation pursuant to ECL 34-0104. Village Code, article II, § 49-7 requires the issuance of a coastal erosion management permit before certain activities within a coastal erosion hazard area may be undertaken. There is no proof at all in this case as to whether an erosion management permit has been requested pursuant to this section.

The governing enactments cited above require issuance of a permit in connection with the building of certain structures,

including revetments, in certain areas, including the "ocean beach area," which is defined as a single area between the East Hampton and Brookhaven town lines, with a southern border defined by the Atlantic Ocean, and with a northern border defined by reference to the crest of a single, "primary" dune. Thus, this definition presumes the existence of one, singular, and relatively continuous dune running from west to east parallel to the ocean. It is the imaginary line that may be traced along the crest of this dune that, under the terms of these enactments, defines the northern limit of the "ocean beach area." The problem presented in this case, as well as in *Allen*, is simply this: the dune has largely or totally disappeared in the vicinity of the subject properties; therefore, the key line of reference contained in the governing legislation which defines the northern border of the Board's jurisdiction has likewise disappeared.

The problem, then, is how to define the northern limit to the "ocean beach area" in those places where the crest of the primary dune, by reference to which the northern limit of the "ocean beach area" is defined in the local law, no longer exists, due to the disappearance of extensive portions of the dune itself. We are not persuaded that, in such places, the jurisdiction of the Board has no northern limit at all, and we do not understand the Board to be making this argument. Also, we are not persuaded by the argument that the line tracing the crest of the primary dune as it existed several years before the dune's destruction may, in the absence of any alternative evidence, be considered definitive. The mobility of dunes is not the subject of debate; in light of this circumstance, the only possible conclusion is that it is the location of the crest of the dune as of the time of the application for the revetment permit which must be considered governing.

One workable way to apply the local law defining the "ocean beach area" with reference to the crest of a primary dune running from east to west in a case where, as in the case at hand, a portion of that dune has disappeared would be by reference to the crest of those portions of the dune which remain, both to the east and to the west of the interrupted portion or portions of the dune, and closest to it or to them. There may be other workable approaches; this is a matter of determining what practice a surveyor would commonly use, as to which there is no evidence in the present record (*cf. Dolphin Lane Assoc. v Town of Southampton,* 37 NY2d 292, 297).

We take judicial notice of the fact that, in *Allen*, the line which on Poster's site plan is designated as the "top of erosion

scarp" as of 1998 is essentially an extension of the line which, in Allen's site plan is designated as the crest of the "dune." Thus, there is an issue of fact to be decided even as to the proper definition of a "dune" as opposed to a "scarp." If the 1998 "scarp" line on Poster's plan, and the 1998 "dune" line on Allen's plan, of which Poster's "scarp" line is a continuation, trace what can properly be called the crest of the "primary dune," then the Board's jurisdiction would be established based on these site plans, both of which show that the proposed revetment is to the south of that line, and hence within the "ocean beach area." Even if the top of the "scarp" is not synonomous with the top of the "primary dune," the scarp line may be valid proof of where the dune line should be placed pursuant to the standard outlined above. The present record does not permit resolution of these factual questions relating to the Board's jurisdiction.

The legal question thus becomes: what are the consequences of this failure of proof? In general, the petitioner has the burden of proving the allegations of his or her petition in a CPLR article 78 proceeding (see *Matter of Bergstein v Board of Educ.,* 34 NY2d 318; *Matter of Abbondandolo v Edwards,* 174 AD2d 737; *Matter of Gramercy N. Assoc. v Biderman,* 169 AD2d 345), including allegations that a local town has exceeded its territorial jurisdiction in applying its zoning rules (see *Matter of Canner v Delameter,* 85 AD2d 771, *affd* 56 NY2d 724 [applying presumption of regularity to town's zoning map and concluding petitioner failed to prove Town exceeded jurisdiction]), just as the plaintiff in an action has the burden of proving the material allegations of the complaint. In a proceeding in the nature of mandamus to review, the petitioner "has an initial burden of presenting factual allegations of an evidentiary nature or other competent evidence" (*Matter of Rodriguez v Goord,* 260 AD2d 736, 736-737). The allegations in the petition-complaint relating to the Board's supposed lack of jurisdiction have not been proved by competent evidence, and, if the rule applied above were to be applied rigorously, then it would be necessary to conclude that the Board had the jurisdiction to grant or deny the permit.

On the other hand, the traditional rule is that the jurisdiction of courts of limited jurisdiction will not be presumed, and that the facts necessary to confer jurisdiction must affirmatively appear from the record when a proper challenge to jurisdiction has been made (see *Thomas v Harmon,* 122 NY 84, 88; *Gilbert v York,* 111 NY 544, 548; *Matter of Greller v Shan-*

*dell B.,* 157 AD2d 840; *People v Dritz,* 259 App Div 210), and this rule has been applied in the context of determinations made by public officers subject to review in proceedings in the nature of applications for writs of certiorari (*see People ex rel. Hayes v Waldo,* 212 NY 156, 172; *Matter of Blount v Forbes,* 250 App Div 15).

The circumstances of this case are not typical in many respects. Here, the extent of the Board's jurisdiction is defined, in part, by reference to a line (the crest of the primary dune) which, as the Board itself freely concedes, is mobile even in the best of conditions. New York case law has not previously defined how the jurisdiction of a town or other agency should be limited, where the governing laws or ordinances define the territorial scope of such jurisdiction with reference to the crest of a dune substantial segments of which have been destroyed. Neither side had an opportunity to demonstrate, by competent evidence, the scope of the Board's jurisdiction in accordance with the standard outlined above. Under these particular circumstances, the Supreme Court should have granted Poster's request for a hearing on the jurisdictional issue (*see* CPLR 7804 [h]). We note that, just as Poster requested such a hearing in the context of this proceeding and action, the Board, in its status as an appellant in *Allen* also requests, in the alternative, a hearing on this issue. Under these circumstances, we consider it most opportune to direct a hearing on this issue in connection with both of these related hybrid proceeding-actions.

The arguments of both Poster and the Board on the "jurisdictional" issue are largely inapt. In this case, Poster sought, and was denied, a particular permit required by specific local laws, as outlined above. The laws referred to above apply to projects undertaken by homeowners irrespective of whether such projects might interfere with the Town's property rights. In other words, the Board in this case is purporting to act pursuant to local laws enacted by it pursuant to the police powers delegated to it from the State. Poster's argument to the effect that the Board's jurisdiction depends on the Town's having title to, or an easement over, the area in question is thus without merit. Poster's rights as a landowner, including his rights as a riparian landowner, "must yield to the [Town's] exercise of police power" (*Matter of Haher's Sodus Point Bait Shop v Wigle,* 139 AD2d 950, 951).

Much of the case law cited by the parties is, for this reason, not pertinent. Case law which addresses the alleged conflicts between the exercise of the State's sovereign powers in connec-

tion with the fishing industry, on the one hand, and the Town of Southampton's supposed private title to certain coastal waters pursuant to colonial patents, on the other hand (*see State of New York v Trustees of Freeholders & Commonalty of Town of Southampton, supra*), or case law defining the extent of the "jus publicum" (the public's right of navigation, fishing and bathing) which affects areas between the high and the low water mark (*see Tiffany v Town of Oyster Bay,* 234 NY 15, 20), is not relevant to the question presented here, which concerns only the definition of the term "ocean beach area" under local law for the purposes of establishing whether the Board has the right to insist on Poster's obtaining a permit prior to his constructing a revetment. If the Board wishes to prohibit construction of the revetment on the basis that it interferes with the "jus publicum," its remedy is to bring an action for a permanent injunction, in which case its jurisdiction is not limited by the provisions of the local laws which govern its power to grant or deny permits for the construction of revetments within the "ocean beach area" as defined in the local laws noted above (*e.g. Tucci v Salzhauer, supra; see also Town of Islip v Powell,* 78 Misc 2d 1007).

The case of *Matter of Rottenberg v Edwards* (103 AD2d 138) is similarly inapt. In *Rottenberg*, this Court rejected a challenge, advanced by a homeowner who wished to construct groins in the navigable waters of Gardiner's Bay, to the jurisdiction of the Zoning Board of Appeals of the Town of East Hampton, which claimed the power to prohibit such construction. The homeowner alleged that the Town's assertion of authority in this area impeded on the State's general jurisdiction over navigable waters. This Court disagreed, relying on Navigation Law § 2 (4) for the proposition that, under an exemption traceable to antique royal land grants and patents, certain Long Island townships had the right to control the navigable waters within their jurisdictions (*see Matter of Rottenberg v Edwards, supra* at 140-141; *State of New York v Trustees of Freeholders & Commonalty of Town of Southampton,* 99 AD2d 804, *supra; People ex rel. Howell v Jessup,* 160 NY 249; *People v Miller,* 235 App Div 226, *affd* 260 NY 585; *cf. People v James H. Rambo, Inc.,* 36 NY2d 1008). In the case at hand, we are not concerned with whether the local laws which allegedly require Poster to obtain a permit prior to constructing his revetment are in conflict with state or federal laws; no such issue is raised in the combined petition and complaint.

Poster also argues, in his second point, that the "return" submitted by the Board in opposition to the petition-complaint

included matters "dehors the record," in the sense that it included materials which had not been placed in evidence at any hearing before the Board. He argues that, assuming that the Board had jurisdiction, its determination is arbitrary and capricious. If correct, this argument would warrant reversal of so much of the judgment appealed from as confirmed the Board's determination, and would further warrant annulment of that determination, thus rendering academic the jurisdictional issue noted above. We therefore address this argument on the merits.

Rules, article VII, § 1 (E) sets forth a procedure for review of permit applications. Pursuant to Rules, article VII, § 1 (E) (1), the Board, in its discretion, may, but need not, hold a public hearing. Pursuant to Rules, article VII, § 1 (E) (5), in reviewing the application, the Board is to give "appropriate weight" to "the protection of the environment and conservation of natural resources," as well as to countervailing "social and economic considerations."

Here, although at one point in the petition and complaint Poster asserts that a "hearing" was conducted on March 5 and April 5, 1999, it is clear that this does not refer to any evidentiary hearing. As Poster himself emphasizes, and as Strough freely conceded, the only papers before the Board were those submitted in support of the permit application, which are in nonevidentiary form. In fact, as noted in *Allen*, even the "hearing" which took place in that case was essentially an informational hearing, and not an adjudicatory hearing within the meaning of CPLR 7803 (4). To the extent that Poster seeks to annul the determination made in this case, without there having been any hearing directed by law, the relief sought is in the nature of mandamus to review, and the only question is whether the Board's determination was irrational, arbitrary, or capricious (*see e.g. Matter of Scherbyn v Wayne-Finger Lakes Bd. of Coop. Educ. Servs.,* 77 NY2d 753, 757-758; *Matter of Metropolitan Taxicab Bd. of Trade v Boardman,* 270 AD2d 633; *Matter of Hudson Riv. Fisherman's Assn. v Williams,* 139 AD2d 234, 238; *Matter of Brothers v Pilgrim Psychiatric Ctr. of N.Y. State Off. of Mental Health,* 131 AD2d 756). The Board is vested with "untrammeled * * * discretion" (*Cummings v Town Bd. of N. Castle,* 62 NY2d 833, 835; *Matter of Larkin Co. v Schwab,* 242 NY 330, 335) and its determination may be annulled only upon a clear showing that it acted "solely upon grounds which as [a] matter of law may not control [its] discretion" (*Larkin Co., supra,* quoted in *Cummings, supra; Matter of Banner v Moore,* 117 AD2d 917, 918).

CPLR 7803 distinguishes between a proceeding to review "whether a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence" (CPLR 7803 [4]), on the one hand, and a proceeding to review "whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion" (CPLR 7803 [3]), on the other hand. The distinction reflects the difference between the common-law writ of certiorari to review, where the court must determine the "substantiality of the evidence" (*Matter of 125 Bar Corp. v State Liq. Auth. of State of N.Y.,* 24 NY2d 174, 178), and the common-law writ of mandamus to review, in which the Court must determine "the rationality of the administrative act" (*Matter of 125 Bar Corp. v State Liq. Auth. of State of N.Y., id.*).

This critical distinction is also reflected in the terms of CPLR 7804 (g), which directs the Supreme Court, in connection with any proceeding in the nature of certiorari to review (CPLR 7803 [4]), to transfer the proceeding to the Appellate Division for review of any "substantial evidence" question. As pointed out in the Practice Commentaries, the nature of "substantial evidence" review is akin to appellate review of a trial record; in fact, prior to the enactment of CPLR article 78, "certiorari proceedings were commenced in the Appellate Division" (Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C7804:8, at 659-660). In proceedings in the nature of mandamus to review (CPLR 7803 [3]), by way of contrast, there is no record made before the agency comparable to a trial record. It is for this reason that hearings in the Supreme Court (*see* CPLR 7804 [h]) "occur with greater frequency in mandamus proceedings" (Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C7804:9, at 664).

Poster, as the petitioner in this proceeding seeking mandamus to review, was free to submit to the Court any "competent and relevant proof * * * showing that any of the underlying material on which the [Board] based its determination has no basis in fact," or challenging the expertise of the members of the Board, or in support of his contention that the Board's determination was irrational or arbitrary (*Matter of Mandle v Brown,* 5 NY2d 51, 65; *Matter of Newbrand v City of Yonkers,* 285 NY 164, 178; *Matter of Hodgins v Bingham,* 196 NY 123, 126-127; *Matter of Holy Spirit Assn. for Unification of World*

*Christianity v Tax Commn. of City of N.Y.,* 62 AD2d 188; *cf. Matter of Simpson v Wolansky,* 38 NY2d 391, 395-396). The Board was free to present evidence supporting its policy against hard structures. The evidence submitted by the Board convincingly showed that the policy against hard structures had a sound basis in science, and that such structures ultimately do more harm than good in respect to a region's overall efforts to minimize the natural forces of erosion. Poster had every opportunity to submit evidence to the contrary, and failed to do so. He likewise failed to produce any evidence that damage to his house was imminent, or that alternative methods of avoiding any such potential damage (e.g., moving the house) are not feasible.

As we note in *Allen*, Poster might have requested the Supreme Court, in reviewing the present petition and complaint, to consider the content of the record before it in the then-pending *Allen* case. The record before the Board, and before the Supreme Court in that case, contains just the sort of scientific data that supports Poster's argument that his proposed revetment would not exacerbate the erosion of the beach area to the west of his property. While we have considered that data, in resolving the appeal at hand, as well as in resolving *Allen*, we conclude that it does no more than illustrate the existence of two schools of thought in connection with the basic question that underlies this case: Do hard structures do more harm than good? On this issue, of course, we are not free to substitute our own opinion for that of the responsible agency; we can do no more than note that the Board's adoption of a policy of prohibiting hard structures cannot possibly be considered arbitrary or capricious. The Supreme Court thus properly concluded that the Board's determination was neither arbitrary nor capricious, and was not subject to vacatur on this ground.

Poster raises no issue on appeal with respect to the Supreme Court's rejection of his remaining arguments.

Accordingly, the judgment is modified, on the law, by deleting the provision thereof dismissing that branch of the combined petition and complaint which was to annul the determination on the basis that it was made in excess of the territorial jurisdiction of the Board, and substituting therefor a provision directing a hearing on that branch of the combined petition and complaint; as so modified, the judgment is affirmed, and the matter is remitted to the Supreme Court, Suffolk County, for further proceedings in accordance herewith.

FEUERSTEIN, LUCIANO and SCHMIDT, JJ., concur.

Ordered that the judgment is modified, on the law, by deleting the provision thereof dismissing that branch of the combined petition and complaint which was to annul the determination on the basis that it was made in excess of the territorial jurisdiction of the Board of Trustees of the Freeholders and Commonalty of the Town of Southampton, and substituting therefor a provision directing a hearing on that branch of the combined petition and complaint; as so modified, the judgment is affirmed, without costs or disbursements, and the matter is remitted to the Supreme Court, Suffolk County, for further proceedings in accordance herewith.